TWO GUYS FROM HARRISON, INC., A CORPORATION, PLAINTIFF-APPELLANT, AND CHANNEL LUMBER CO., A CORPORATION, INTERVENING PLAINTIFF-APPELLANT, v. DAVID D. FURMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, *ET ALS.*, DEFENDANTS-RESPONDENTS.

Argued December 22, 1959—Decided April 4, 1960.

See also 59 *N. J. Super.* 135, 157 *A.* 2d 351.

*Mr. John J. Clancy* and *Mr. David Stoffer* argued the cause for plaintiff-appellant (*Messrs. Clancy and Hayden,* attorneys; *Mr. John J. Clancy, Mr. David Stoffer* and *Mr. Joseph M. Jacobs,* of counsel).

*Mr. Julius Stein* argued the cause for intervening plaintiff-appellant (*Messrs. Stein and Feinseth,* attorneys; *Mr. Julius Stein,* of counsel; *Mr. Kenneth R. Stein,* on the brief).

*Mr. Walter H. Jones* argued the cause for intervening defendants-respondents, R. H. Macy Co., Inc., R. H. Macy Co., Inc. t/a L. Bamberger Co., and Garden State Plaza Corp., *et al.*

*Mr. David M. Satz, Jr.,* Deputy Attorney General of New Jersey, argued the cause for defendant-respondent, David D. Furman (*Mr. David D. Furman,* Attorney General, *pro se; Mr. David M. Satz, Jr.,* Deputy Attorney General, of counsel; *Mr. Robert S. Miller,* Legal Assistant, on the brief).

*Messrs. Wilentz, Goldman, Spitzer & Sills* filed a brief for Perth Amboy Chamber of Commerce and Reynolds Bros., Inc., *amici curiae* (*Mr. Robert N. Wilentz,* of counsel).

*Messrs. Harkavy and Lieb* filed a brief for Rickel Bros., Inc., *amicus curiae.*

The opinion of the court was delivered by

WEINTRAUB, C. J. Plaintiffs attack the so-called Sunday Closing Law, *chapter* 119 of the Laws of 1959, *N. J. S.* 2A :171–5.1 *et seq.* They moved for summary judgment and the Attorney General countered with a motion for judgment on the pleadings. The trial court denied plaintiffs' motion and granted defendant's. 58 *N. J. Super.* 313 (*Law Div.* 1959). We certified plaintiffs' appeal before the Appellate Division acted upon it.

Preliminarily it is well to sketch some highlights of the history of Sunday legislation. Its genesis is traced to the command at Mount Sinai:

"Ye shall keep the sabbath therefore; for it is holy unto you: everyone that defileth it shall surely be put to death: for whosoever doeth any work therein, that soul shall be cut off from among his people. Six days may work be done; but in the seventh is the sabbath of rest, holy to the Lord; whosoever doeth any work in the sabbath day, he shall surely be put to death." (*Exodus* 31 :14, 15.)

*Pfeffer, Church, State and Freedom* (1953), *p.* 227. The Sabbath of Sinai was the seventh day and so remains for the members of some minority faiths, but for most Christians it is the first day of the week.

It is probably true, as Pfeffer points out (*p.* 229), that Sunday legislation was historically the product of Church-State unions. The American colonists brought with them the tradition of a state-established religion, *Tudor v. Board of Education of Rutherford,* 14 *N. J.* 31, 39 (1953), *cert.* denied, 348 *U. S.* 816, 75 *S. Ct.* 25, 99 *L. Ed.* 644 (1954), and perhaps solely for sectarian reasons the authority of colonial government was exerted to support the Christian Sabbath. *Pfeffer, p.* 228. Thus on December 2, 1675, an act was adopted to prohibit "any kind of servile work, unlawful recreations, or unnecessary travels" on the "Lord's Day," excepting only works of mercy or necessity. *Acts of the General Assembly XI, Leaming & Spicer, Grants & Concessions* (2d ed. 1881), *p.* 98. See also *Leaming & Spicer, op. cit., p.* 124, *p.* 245; *Allinson, Acts of the General Assembly of the Province of New Jersey* (1776), *pp.* 3, 4.

The first comprehensive legislation after the Revolution, entitled "An Act for suppressing vice and immorality," was enacted on March 16, 1798. *Paterson's Laws* (1800), *p.* 329, *et seq.* This statute, which follows basically the approach of the colonial act, went beyond the English statute of 1676, 29 *Car.* II, *c.* 7, the prototype for most legislation by the states. The English statute prohibited the pursuit of one's usual vocation, whereas our act was not thus confined, with the result, for example, that a Sunday contract, unrelated to the usual occupation of the parties, was held to be unlawful. *Reeves v. Butcher,* 31 *N. J. L.* 224, 225 (*Sup. Ct.* 1865).

In 1926 the New Jersey Blue Law Revision Commission was created by Joint Resolution. In its final report of January 7, 1927, the Commission recommended that all forms of recreation be permitted on the Sabbath, subject to municipal regulation. Five bills (A–1, 32, 42, 70 and 252)

were introduced in the Assembly but none passed. The statement attached to A–42 noted that "By a general failure to enforce the present vice and immorality act, the public shows it wants no restrictions on the right to observe Sunday as the individual citizen sees fit with the possible exception that there should not be tolerated on that day amusements for pecuniary profit."

For present purposes, we recite some of the provisions of the Sunday Law as continued in the revision of 1937. *R. S.* 2:207–1 to 30. The first section imposed a fine of $1 for a violation of its provisions:

"No traveling, worldly employment or business, ordinary or servile labor or work either upon land or water, except works of necessity and charity, and no shooting, fishing, * * * sporting, hunting, gunning, racing, frequenting of tippling houses, or any interludes or plays, dancing, singing, fiddling or other music for the sake of merriment, playing at football, fives, nine pins, bowls, long bullets or quoits, nor any other kind of playing, sports, pastimes or diversions shall be done, performed, used or practiced by any person within this state on the Christian Sabbath, or first day of the week, commonly called and hereinafter designated as Sunday."

Section 2 excluded from the ban against traveling, the "going to or returning from any church or place of worship within the distance of twenty miles, or going to call a physician, surgeon or midwife, or carrying mail to or from any post office, or going by express by order of any public officer * * *." Section 5 excluded "the dressing of victuals in private families or in lodging houses, inns and other houses of entertainment for the use of sojourners, travelers or strangers." Section 6 prohibited selling. Section 11 provided for a fine of $8 if any stage shall be driven "and sufficient reason shall not be offered to show that it be done in cases of necessity or mercy," *etc.*

The foregoing illustrates the stern approach of the Sunday law. The sole significant exception (*R. S.* 2:207–18 *et seq.*) permitted, but only upon adoption of the act by municipal referendum, any person to:

"* * * (a) print, publish and sell newspapers, (b) sell and deliver milk, (c) walk, ride or drive for recreation, (d) hire horses and carriages or other conveyances for riding and driving, or (e) engage or take part in any form of recreation, sport, or amusement that is not unlawful on other days of the week, if in so doing such person or corporation does not disturb others in their observance of Sunday,"

subject to local regulation of recreation, sports or amusements. This exception was introduced by *P. L.* 1933, *c.* 115, although it had first appeared in somewhat different form in *P. L.* 1893, *c.* 24.

In 1951 there began a series of events which contributed a comic-opera touch to this delicate subject. In that year, Title 2 was revised. With respect to Sunday laws, the tentative draft cryptically recommended "Repeal, obsolete." The backdrop was widespread indifference to "blue laws," the archaic character of much of its content, and the absurdly ineffectual penalties then existing ($1 for most violations). The Legislature however did not follow the recommendation but rather revised the language and eliminated all penalties. The foreword to the revision explained:

"The general object of the Revision of the Sunday laws (*N. J. S.* 2A :171–1 to 2A :171–12) was not to make broad changes in substance, but rather to eliminate obsolete provisions. It was intended to leave municipalities with the power, they theretofore had, to control and regulate Sunday activity."

*N. J. S.* 2A :171–1 of the 1951 revision replaced extensive verbiage with a single sentence:

"No worldly employment or business, except works of necessity and charity, shall be performed or practiced by any person within this state on the Christian Sabbath, or first day of the week, commonly called and hereinafter designated as Sunday."

Yet the sweep of the "blue law" remained. Whereas in other jurisdictions the concept of "necessity" could be and was inflated to meet reasonably the taste and habits of new generations, here the term remained inelastic. This was so because the following section, *N. J. S.* 2A :171–2, excluded

only "the preparation and sale of drugs, meals, prepared food and non-alcoholic beverages on Sunday" and "sales of alcoholic beverages which are otherwise subject to regulation under Title 33 of the *Revised Statutes.*" Furthermore, although the explicit prohibition against "traveling" and various recreational activities expressed in the earlier statute was not specifically repeated in the revision, yet *N. J. S.* 2A :171–6 continued the earlier provision which, only upon adoption of the act by local referendum, permitted walking, riding or driving for recreation; hire of conveyances for riding and driving; participation in any form of recreation, sport or amusement; and such routine matters as the publication and sale of newspapers and the sale and delivery of milk. See *Hertz Washmobile System v. South Orange,* 41 *N. J. Super.* 110, 130–31 (*Law Div.* 1956), affirmed 25 *N. J.* 207 (1957). Thus the rigid policy of the earlier law was continued, without, however, the aid of penalties.

The revision of 1951 presumably placated the religiously sensitive without pain to those who preferred secular pursuits. In the year of its adoption the solution was not provocative; indeed it came virtually without comment. But shortly thereafter the scene changed. Retail operations spread rapidly upon highways and Sunday selling mounted dramatically. The urban merchant could not effectively meet the challenge. The major roads, already burdened by non-commercial travel, strained under the added stress. Religious observants of the Lord's Day resented the added hustle and bustle. Economic pressures compelled labor by many who preferred diversion. Thus Sunday closing returned to the stage. Motivations, divergent and internally incongruous, converged upon a single objective. What historically may have been solely a matter of religious concern became a social and economic issue. The statute had not been designed to meet the new problem.

Events moved so rapidly that the revision of 1951 was soon before us for interpretation. An effort was made to prosecute a Sunday operation on the thesis that despite the repeal of the $1 penalty the revision should be held to

denounce an infraction as a disorderly persons offense, carrying a maximum penalty of one year imprisonment and a fine of $1,000. A majority of the court could find no such purpose, adding that while the statute's "effect on a criminal proceeding instituted, such as the one here, produces an anomaly the most that this court can do is call the attention of the Legislature to the result." *State v. Fair Lawn Service Center, Inc.*, 20 *N. J.* 468, 474 (1956).

As noted above, the foreword of the 1951 revision stated municipalities retained "the power, they theretofore had, to control and regulate Sunday activity." Municipalities sought to meet the new problem but faced formidable difficulties. First, municipalities, if they legislated, had to adhere to the unrealistic and generally unpalatable policy of the State as established and continued in the revision. We are informed that but three of the 567 municipalities adopted conforming ordinances. Efforts to adopt different policies failed because of the restraining effect of the policy established by the state law. *Auto-Rite Supply Co. v. Woodbridge Twp.*, 25 *N. J.* 188 (1957); *Hertz Washmobile System v. South Orange*, 25 *N. J.* 207 (1957). Second, the problem not being localized by municipal boundaries, a municipality could not protect itself from the activities of its neighbors. Hence pressure developed for a state-wide or regional approach.

Among the sections of the State, economic interests and citizen habits were irreconcilable. The resort areas or much of them wanted no part of Sunday closing. A compromise emerged in the form of *chapter* 138 of the *Laws of 1958*, *N. J. S. 2A* :171–5.1 *et seq.* It prohibited the sale of certain categories of commodities in 18 of the 21 counties. That act was declared unconstitutional in *Sarner v. Township of Union*, 55 *N. J. Super.* 523 (*Law Div.* 1959) on the ground that the exclusion of three counties was arbitrary. No appeal was prosecuted.

Thereupon the Legislature adopted the statute assailed in the present case. It follows substantially the pattern of

the act adjudged invalid in *Sarner* except that in lieu of the provision for operative effect in 18 counties the act is operative only in such of the 21 counties as may adopt it upon referendum. At the election of November 1959 the act appeared on the ballot in 15 counties. It was adopted in 12 and failed in the remaining three. The present case was started before the election but decision was withheld, apparently by consent, until after the votes were tallied.

## I.

Plaintiffs assert the statute is beyond the police power of the State; that it contravenes the ban against the union of State and Church in the *Federal Constitution* (*First* and *Fourteenth Amendments*) and in the *State Constitution* (*Art.* I, *par.* 4); and that if the act can survive critical inquiry as to power to legislate, nonetheless the classification of what may and may not be sold denies equal protection of the law guaranteed by the *Fourteenth Amendment* and the *State Constitution*. *Washington National Insurance Company v. Board of Review,* 1 *N. J.* 545 (1949). Reliance is also placed upon the concluding paragraph of *Article* IV, § 7, *par.* 9 of the *State Constitution,* providing that "The Legislature shall pass general laws * * * for all * * * cases which, in its judgment, may be provided for by general laws."

The Legislature did not recite the facts it found. Nor is there any legislative history to aid us in this fundamental inquiry. We accordingly must probe for the answer within the context of the statute itself with such help as the general background of the subject may afford. Our task is made even more difficult by the circumstance that we must choose between what the Legislature said and what it did. Specifically, in our view as will presently be enlarged upon, the validity of chapter 119 depends upon whether it merely supplements the revision of 1951, *N. J. S.* 2*A*:171–1 *et seq.* (hereinafter called "the 1951 revision") or supersedes its policy.

Chapter 119 is entitled:

"An act concerning the observance of the first day of the week, commonly known as Sunday, and providing penalties for engaging in the business of selling or offering to sell or attempting to sell clothing or wearing apparel, building and lumber supply materials, furniture, household and office furnishings and appliances on Sunday, and supplementing *chapter* 171 of *Title* 2A of the *New Jersey Statutes*, and providing that such act shall not be operative in any county unless and until the voters thereof by referendum shall determine that it shall apply therein."

Section 1 prohibits the sale or offer to sell at retail, wholesale or auction of the categories of articles described in the title "except as works of necessity and charity or as isolated transactions not in the usual course of the business of the participants." A violator is made a disorderly person. The fines are graduated to a maximum of $500 depending upon the number of offenses, and imprisonment for 30 days is additionally authorized for a third offense and up to six months for a fourth or subsequent offense. A single sale or offer constitutes a separate violation. Section 2 further provides that upon four convictions the premises shall be deemed a nuisance. Section 4 reads in part:

"This act shall be construed as an additional remedy to secure proper Sunday observance * * *."

## II.

In dealing with the constitutional attacks, we shall first assume chapter 119 is a supplement to the 1951 revision and is designed to provide "an additional remedy" for its enforcement, as the Legislature has described it.

## A.

The first issue is whether the 1951 revision violates the edict of the *First Amendment* as made applicable by the due process clause of the *Federal Constitution,* that a state:

"* * * shall make no law respecting an establishment of religion,"

or of *Article* I, *par.* 4 of the *State Constitution* that:

"There shall be no establishment of one religious sect in preference to another."

If the revision is thus vulnerable, both it and chapter 119, as a mere supplement to it, would fall.

■ We have no doubt that our *State Constitution* forbids Sunday legislation designed to support as such the tenets of any sect, however dominant, or to protect as such the religious sensibilities of members of any faith or for that matter of all faiths. In *Tudor v. Board of Education, supra* (14 *N. J.* 31), this court unanimously held that a board of education could not permit the distribution of the King James version of the New Testament. The court there accepted (14 *N. J.*, at *page* 44) as definitive of the *State Constitution* the view of the *Federal Constitution* expressed in *Everson v. Board of Education,* 330 *U. S.* 1, 15, 18, 67 *S. Ct.* 504, 91 *L. Ed.* 711, 723, 724–25 (1947):

"The 'establishment of religion' clause of the *First Amendment* means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. * * *
* * * That Amendment [First] requires the state to be neutral in its relations with groups of religious believers and non-believers."

Hence if the 1951 revision was fashioned for such purpose, we could not sustain it under the *Constitution* of our State. We think that upon the same hypothesis the United States Supreme Court would reach the same result under the *Federal Constitution*. This, we believe, is the inevitable thrust of the opinions of that tribunal discussed in *Tudor*. Indeed, in *Zorach v. Clauson,* 343 *U. S.* 306, 314, 72 *S. Ct.* 679, 96 *L. Ed.* 954, 962 (1952) appears the incidental observation that a state "may not coerce anyone * * * to observe a religious holiday," which, we take it, refers not only to compulsion to attend services but also to compulsion to desist from activity merely because it offends

the creed of others. We find nothing to the contrary in *Hennington v. Georgia*, 163 *U. S.* 299, 16 *S. Ct.* 1086, 41 *L. Ed.* 166 (1896); *Petit v. Minnesota*, 177 *U. S.* 164, 20 *S. Ct.* 666, 44 *L. Ed.* 716 (1900) or in *Friedman v. People*, 341 *U. S.* 907, 71 *S. Ct.* 623, 95 *L. Ed.* 1345 (1951), which dismissed for want of a substantial federal question the appeal from the judgment of the New York Court of Appeals, 302 *N. Y.* 75, 96 *N. E.* 2*d* 184 (1950). In none of those cases was the state law deemed locally to be a measure to protect as such the religious character of the Sabbath. The rationale of the statutes in *Hennington* and *Petit* was in secular terms, to protect the public health and welfare against the hurt of uninterrupted labor. And in *Friedman,* the New York court carefully eschewed a religious objective, saying the Legislature "recognizes Sunday as a day for rest, play, relaxation and recreation rather than merely as a religious Sabbath." (96 *N. E.* 2*d,* at *page* 186.) *Cf. Two Guys from Harrison-Allentown, Inc. v. McGinley,* 179 *F. Supp.* 944 (*D. C. E. D. Pa.,* Dec. 1, 1959), probable jurisdiction noted, 80 *S. Ct.* —— (1960); *Crown Kosher Super Market of Mass., Inc. v. Gallagher,* 176 *F. Supp.* 466 (*D. C. Mass.* 1959), probable jurisdiction noted, 80 *S. Ct.* —— (1960).

██ If in truth Sunday statutes were enacted in the Colonies solely to achieve sectarian ends, it would be of no consequence in this constitutional inquiry. We think it plain that the ban against the union of Church and State was intended to break with the past rather than to imbed the practices the colonists had brought with them. *Everson v. Board of Education, supra.* The union of Church and State had spawned centuries of bloodshed and oppression. Religious persecution and discrimination continued in the New World. See *Tudor* and *Everson, supra.* Even our colonial *Constitution of* 1776, while assuring freedom of worship (*Art.* XVIII) and prohibiting the establishment of a religious sect (*Art.* XIX), guaranteed only members of the Protestant faith against the denial of civil rights and the right to hold

public office (*Art.* XIX). It was upon our soil that religion was truly liberated, and this by divorcement from both the support and the restraint of government. The "wall of separation" rose from a conviction, easily renewed from current events elsewhere, that the union of Church and State is mutually baneful, incurring for each the hostility of those who dissent from the other.

 The question, therefore, is whether the 1951 revision was in fact enacted to serve religious interests. Preliminarily, it may be said that an affirmative answer cannot be found in the naked circumstance that the policy of a statute coincides with the views of a sectarian group. For example, the State may denounce murder, larceny, and adultery, notwithstanding that religions also proscribe those acts. Generally, Sunday statutes prohibit the pursuit of one's regular calling on the Sabbath. As already indicated in our reference above to *Hennington* and *Petit,* the claimed purpose is to protect against physical and moral debasement consequent upon uninterrupted labor. It is upon that basis that the prevalent type of Sunday law is sustained. *Auto-Rite Supply Co. v. Woodbridge Twp., supra* (25 *N. J.;* at *page* 192); 50 *Am. Jur., Sundays and Holidays,* § 9, at *p.* 808. An identification between seven days of labor and the public health, safety, morals and welfare cannot be denied. Indeed, for all we know, the command at Mount Sinai may also have been addressed to the same objective. At any rate, if the secular and sectarian motivations should be different, the power of the State is not preempted by the circumstance that religion was first upon the scene.

If the Legislature prohibited a seventh day of regular labor without banning work on a specific day, the secular motivation would be unobscured. It is the selection of the Christian Sabbath which suggests religious orientation. But again the Church and State meet on common ground in pursuit of their respective interests. The fact is that Sunday has acquired a special character differentiating it from the other days of the week and this without reference to religious

connotation. Today Sunday is many things to many people. It is a day upon which the vast majority of citizens seek respite from the pressures and demands of ordinary routines. To some, it is a day for religious devotion alone. To others, whether or not members of faiths commanding religious observance, it is a secular holiday, a day for play, hobbies, recreation or relaxation. To still others, it is a combination of all of these. It is a day for family and friendly reunions. Most people want Sunday for themselves to do as they feel they should, each to prepare himself in his own way to meet the demands of Monday morning.

Thus the public health and welfare are implicated when the hustle and bustle mount and intrude unreasonably upon opportunities for rest, leisure and diversion. The inroad may be in terms of direct interference as, for example, when commercial activities add to highway traffic to the discomfort of the Sunday driver or otherwise impinge upon a scene conducive to rest, diversion and recreation. The inroad may be indirect but equally real as when those who want to be free on Sunday find the economic aims of their employer compel them to work to hold their jobs, or when the economic impact upon employers requires them and their staffs to remain at the grindstone. Hence we cannot say that Sunday may not constitutionally be selected by the Legislature in pursuit of a purpose to provide relief from the routine. *Auto-Rite Supply Co. v. Woodbridge Twp., supra* (25 *N. J.*, at *page* 192); *Hennington v. Georgia, supra* (163 *U. S.*, at *p.* 304, 16 *S. Ct.* 1088, 41 *L. Ed.*, at *page* 169); *Lane v. McFadyen*, 259 *Ala.* 205, 66 *So. 2d* 83, 85 (*Sup. Ct.* 1953); *Tinder v. Clarke Auto Co.*, 238 *Ind.* 302, 149 *N. E. 2d* 808, 814–815 (*Sup. Ct.* 1958); *Humphrey Chevrolet v. City of Evanston*, 7 *Ill. 2d* 402, 131 *N. E. 2d* 70, 72, 57 *A. L. R. 2d* 969 (*Sup. Ct.* 1956); *State v. Weiss*, 97 *Minn.* 125, 105 *N. W.* 1127, 1128 (*Sup. Ct.* 1906). The question whether that legislative decision impinges upon the freedom of those who observe religiously the seventh day of the week may be another matter. See

*Crown Kosher Super Market of Mass., Inc. v. Gallagher, supra* (176 *F. Supp.* 466). It is not before us, and we intimate no view.

The difficulty with the 1951 revision is that, unlike the usual type of Sunday law, it goes far beyond the objective of a day of respite from uninterrupted labor. It bans (although without present penalty) all forms of recreation. Even walking for pleasure is denounced, except upon approval by local referendum. One is hard put to find a fair connection between such restraints and any known threat to the public health, safety, morals or welfare. The puritanical theme of the act strongly suggests orientation to a sectarian desire to protect the Sabbath as such against "desecration." If such is not the purpose, then in any event it is difficult to find a basis under the police power for such extraordinary restraint upon individual freedom.

We have discussed this constitutional issue with respect to the 1951 revision with no purpose to decide it. We need not decide it because, for other reasons momentarily to be stated, chapter 119 cannot be upheld if it seeks to implement the policy of the revision. The discussion nonetheless remains useful, for it relates to the same Church-State issue to which we will later refer in dealing with the validity of chapter 119 viewed as an independent statute rather than as a supplement to the prior law.

### B.

If chapter 119 merely supplements the 1951 revision, it must be deemed to be addressed to the same evil which the revision found and to the same legislative objective. Upon that premise, chapter 119 cannot be sustained because its classification of what may and may not be sold is wholly unrelated to that evil and objective and accordingly it denies equal protection of the law.

Few issues are more troublesome than that of classification. In *N. J. Restaurant Assn. v. Holderman,* 24 *N. J.* 295, 300 (1957), we said:

"The burden of demonstrating that a statute contravenes the equal protection clause is extremely formidable, as is attested by the long trail of failure. In addition to the strong presumption of constitutionality with which all organic challenges are approached, one who assails a statute on this ground must contend with principles of unusual elasticity. It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. [Citations omitted.] The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, * * * or because of 'some substantial consideration of public policy or convenience or the service of the general welfare.' *De Monaco v. Renton,* 18 *N. J.* 352, 360 (1955). Hence it may 'stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact.' *Dominion Hotel, Inc. v. State of Arizona, supra* (249 *U. S.* [265] at *page* 268, 39 *S. Ct.* [273] at *page* 274 [63 *L. Ed.* 597]). * * *"

In applying these principles, we must first ascertain the evil the Legislature found and then measure against it the reasonableness of the classification. The evil, as revealed by the scope of the 1951 revision, was an impairment of public health consequent upon uninterrupted labor. Work was found to be consistent with the public welfare only in the area of necessity and charity, the concept of necessity being, as we have already pointed out, exceedingly narrow and tight. More than that, the evil may fairly be said to have been found in virtually all activity, for the revision denounced even recreation except upon local referendum. In brief, the Legislature found the public weal required restraints which in substantial effect would compel rest. Such being the

conception of the evil, we cannot fathom any reasonable basis for the differentiation in chapter 119 of the work area embraced in the sale of the items it proscribes from the work area it leaves untouched. The classification accordingly offends the demands of equal protection of the law unless the discrimination may be relieved of its otherwise arbitrary character by resort to the subsidiary rules summarized in the foregoing excerpt from *Holderman*.

■ As stated in *Holderman*, a discrimination which in the nature of the subject matter would otherwise be invidious may be relieved of that character if, generally speaking, a rational basis may be found for it in terms of degrees of evil or in the practical problems inherent in the process of legislating or in enforcement. None of these rules can save chapter 119 from constitutional infirmity.

The reason why a Legislature may strike at an evil where it finds it without first surveying the entire scene in which it may exist even in equal degree is an inescapable concession to the practicalities of a complex social and economic order. The legislative process would be hamstrung if the Legislature had to explore every nook and corner before it acted. But such is not the situation here for in the 1951 revision the Legislature located the evil and indeed found it to exist in every phase of activity other than in works of necessity and charity and the exceptions permitted upon local referendum. Hence the discrimination in chapter 119 cannot be sustained upon the thesis that there was a practical difficulty in ascertaining the extent of the area contaminated by the evil. Nor can it be said that in chapter 119 the Legislature chose to hit the evil where it felt it most for, still upon the hypothesis that chapter 119 implements the policy of the earlier law, the evil had been found worthy of condemnation throughout the entire scene. Nor can it be said that a practical problem of enforcement warrants the discrimination, for quite obviously the prohibition of only some commercial sales serves to create a problem of enforcement which would not exist if the sanctions were addressed

to the whole area embraced by the policy of the revision. Hence upon none of these principles can the Legislature, in pursuit of the objective of the revision, discriminate between the commercial activities covered by chapter 119 and those beyond its reach.

We explored still other possibilities in discharge of our duty to sustain a statute if it is possible to do so. Hence we posed the question, can the classification be sustained on the thesis that the Legislature found that despite the lack of penalties the 1951 revision had been complied with by all except those who sold the items covered by chapter 119, and thus the purpose was to introduce sanctions in the area where needed? Prior to the elimination of the meager penalties by the revision of 1951, a number of municipal ordinances were sustained although they selected only some activities for punishment. The theme, quite tongue-in-cheek, apparently was that the court should assume the statutory ban was effective except in the limited areas in which local government added its weight. But, with the repeal of the penal provisions in 1951, the courts could not indulge in an assumption of voluntary compliance with a non-penal measure and hence the reality was acknowledged that such ordinances in truth sought, not to support the state policy, but rather to establish another policy under which some activity would be denounced while other activity equally within the State's policy continued undeterred. *Auto-Rite Supply Co. v. Woodbridge Twp., supra* (25 *N. J.,* at *page* 195); *Hertz Washmobile System v. South Orange, supra* (41 *N. J. Super.,* at *pages* 125–126). So here, it would be absurd for us to pretend the Legislature found its toothless declaration of policy in the 1951 revision had been honored by all but the vendors of the articles proscribed by chapter 119. That much we can reject upon the basis of what teemed about us.

Another similar possibility was examined. Prior to the removal of penal sanctions from the Sunday law, it had been held that habitual violations of that law brought the

owner of the place within the common-law crime of maintaining a disorderly house punishable under what is now *N. J. S.* 2*A* :85–1 by a maximum of three years imprisonment and a fine of $1,000. *State v. Reade,* 98 *N. J. L.* 596 (*Sup. Ct.* 1923). The further question we accordingly raised was whether, notwithstanding the elimination of the penal provisions by the 1951 revision, habitual violations of its policy remained indictable, so that chapter 119 might be viewed as a measure intended to impose additional penalties where existing criminal liability had proved inadequate. Counsel who appeared in defense of the statute were unable to agree upon the answer to the question.

We think a ready answer can be found in the notorious fact that Sunday selling had not been dealt with as a crime and hence the Legislature could hardly have intended to bring up reinforcements. At any rate, we cannot find a reasonable basis for the disorderly house approach. It is true that the common-law crime has been applied in this State quite broadly to habitual violations of non-penal prohibitory statutes. See *State v. Martin,* 77 *N. J. L.* 652 (*E. & A.* 1909); *Haring v. State,* 51 *N. J. L.* 386 (*Sup. Ct.* 1889), affirmed 53 *N. J. L.* 664 (*E. & A.* 1891); *cf. State v. Western Union Telegraph Co.,* 12 *N. J.* 468 (1953), appeal dismissed 346 *U. S.* 869, 98 *L. Ed.* 379 (1953). But in the last analysis it is the legislative intent which must prevail. It is difficult to find that a Legislature which eliminated the penalty of $1 nonetheless desired that Sunday selling be punishable as a full-blown crime with a maximum of three years and $1,000. *Cf. In re Vince,* 2 *N. J.* 443, 451 (1949). Surely the legislators who voted for chapter 138 of the *Laws of* 1958 (declared invalid in *Sarner*) and for chapter 119, with its provisions for county-wide referenda, would be startled to learn from us that Sunday selling entails such drastic consequences everywhere in the State. No less surprised would be the prosecutors of the 21 counties and the many local enforcement authorities who have not pursued the criminal remedy and who indeed, in the counties

in which chapter 119 was adopted, have assisted merchants in determining what may and may not be sold.

Our conclusion that the common-law crime does not apply to Sunday activity was in a sense foreshadowed by the reasoning in *State v. Fair Lawn Service Center, Inc., supra* (20 *N. J.*, at *page* 468), in which it was found that the Legislature did not intend a violation of the 1951 revision to be punishable as a disorderly persons offense. We feel fortified in this appraisal of the legislative intent by the fact that both before and after *Fair Lawn* the Legislature failed to adopt bills introduced to bring the revision within the Disorderly Persons Act, *N. J. S.* 2*A*:169–1 *et seq.* (see 1953–S148; 1954–S309; 1955–S133 and A–339; 1956–S28 and A64; 1957–A61; 1958–A180 and A215), and to authorize injunctive relief against violations (1955–A430; 1956–A74; *cf.* 1958–A152 and 1959–A656).

We have explored all conceivable facets in search of a tenable ground to uphold chapter 119 as a supplement to the 1951 revision. We can find none. Hence we must conclude that the classification of chapter 119 is not rationally related to the evil to which the revision was addressed, *to wit,* the harm consequent upon uninterrupted work and activity, and accordingly, if viewed as a supplement to the revision, chapter 119 would violate the guarantee of equal protection of the law. Upon the stated hypothesis, similar classifications have been held to be arbitrary: *Auto-Rite Supply Co. v. Woodbridge Twp., supra* (25 *N. J.*, at *pages* 194, 196); *City of Mt. Vernon v. Julian,* 369 *Ill.* 447, 17 *N. E.* 2*d* 52 (*Sup. Ct.* 1938); *Henderson v. Antonacci,* 62 *So. 2d* 5 (*Fla. Sup. Ct.* 1952); *Gronlund v. Salt Lake City,* 113 *Utah* 284, 194 *P. 2d* 464 (*Sup. Ct.* 1948). See *Elliott v. State,* 29 *Ariz.* 389, 242 *P.* 340, 46 *A. L. R.* 284 (*Sup. Ct.* 1926); *Ex parte Westerfield,* 55 *Cal.* 550, 36 *Am. Rep.* 47 (*Sup. Ct.* 1880); *McKaig v. Kansas City,* 363 *Mo.* 1033, 256 *S. W. 2d* 815 (*Sup. Ct.* 1953).

Although the foregoing discussion is in terms of equal protection of the law, it serves also to reveal that chapter

119, far from being designed to implement the 1951 revision, actually establishes a new policy of its own, incompatible with the policy of the earlier law, thus inviting the question to which we now proceed, does chapter 119 supersede the revision, and if so, is it vulnerable to the several constitutional challenges levelled by plaintiffs?

## III.

█ As we will later demonstrate, chapter 119 survives the attacks upon it if it is an independent enactment, unanchored to the policy of the 1951 revision. The threshold question is whether chapter 119 did operate to supersede the policy of the 1951 statute.

█ We must sustain the legislative will if at all possible. To that end we should look through the gloss to the substance of a statute. Thus we recently upheld an enactment as a general law notwithstanding that the Legislature had garbed it as a special one. *In re Freygang,* 25 *N. J.* 357 (1957).

█ Ordinarily the issue of repeal by implication involves the question whether the earlier statute continues in effect. If the later act prescribes a new scheme or approach it will supersede a prior treatment of the matter, *De Ginther v. New Jersey Home, etc.,* 58 *N. J. L.* 354, 358 (*E. & A.* 1895); *cf. State v. Roberts,* 21 *N. J.* 552, 555 (1956), especially if the policies of the statutes cannot coexist. See 1 *Sutherland, Statutory Construction* (*3d ed.* 1943), § 2102, *p.* 463; 82 *C. J. S., Statutes,* § 291 (b), *pp.* 492–3. As the foregoing discussion reveals, on the basis of approach and policy chapter 119 and the 1951 revision are thus incompatible. The 1951 revision embraces the stern policy of general inactivity which we have described. Chapter 119, on the other hand, embraces a radically different policy, one which denounces but a part of the commercial scene and leaves untouched the right of the individual to follow recreational and other pursuits. It is perfectly plain that in

adopting chapter 119 the Legislature contemplated that citizen activities beyond its interdiction will continue unscathed.

Here we have a situation, quite unique, in which the issue is not whether the earlier law may continue notwithstanding the operation of the later statute, but rather whether the later expression of legislative will shall be defeated because of an earlier act. The question is wholly one of legislative intent. We must invoke the normal assumption that the Legislature desired the later expression to prevail unless the statute itself states or the total circumstances strongly imply the contingency that the later act shall fall if it cannot constitutionally coexist with the earlier one.

Chapter 119 does not expressly state that contingency. Nor is it implicit in the characterization of the statute as supplementary to the earlier law. As we have already shown, chapter 119 does not in fact supplement the 1951 revision. We are not dealing with an amendatory or supplementary statute which is so minor that to sustain it at the expense of a pervasive basic statute would be to permit "the tail to wag the dog." Ordinarily such statutes are so incomplete that they would be virtually meaningless if they survived alone. Here, as we have said, chapter 119 is a complete act of legislation, capable of operation without the aid of the prior law and in fact completely dissociated from its provisions. The use of the words "supplementary" and "additional remedy" is too slim to support a denial of the later expression of the legislative will.

Nor can we find the contingency by implication upon an evaluation of the respective contributions of the statute. On the contrary, a comparison strongly supports the overriding effect of chapter 119, for whereas it will operate to achieve some affirmative end, the 1951 revision would remain but a sterile declaration, seemingly serving but two purposes, both of doubtful utility. The first is to restrain the municipalities in the exercise of their police power, compelling them to choose to do nothing or to conform to the discredited terms of the revision. The second is to permit men to

disavow in the name of piety contracts they solemnly make on Sunday, a plea the Judiciary has always rejected whenever events on another day could be seized upon.

The sole remaining circumstance is that at the same session the Legislature also adopted chapter 131, which undertook to exclude from the 1951 revision the sale of perishable agricultural and horticultural products. From this, it is argued the Legislature must have intended the 1951 revision to continue. But that circumstance is equivocal. In fact chapter 119 was passed by the Legislature on May 25, four days after it passed chapter 131 and it may well be that the Legislature sent both bills to the Governor only because it did not know whether he would sign chapter 119. Moreover, we are not required to choose between chapter 119 and chapter 131 since the supersession of the revision by chapter 119 also accomplishes the specific result intended by chapter 131.

Hence we find no justification for departing from the fundamental rule that the later expression of legislative will shall prevail over an earlier one. We of course cannot speak with supreme confidence in the unusual circumstances before us, but we feel sustained by the thought that if perchance we misconceive the legislative intent, that body will quickly correct our error without appreciable loss in the interim.

We accordingly conclude that chapter 119 repealed and superseded the inconsistent policy contained in *N. J. S.* 2A:171–1, 2 and 6 to 12.

This brings us to the question whether chapter 119, thus viewed as an independent statute, is vulnerable to the constitutional attacks before us. We have already indicated it is not. We shall now detail the reasons.

## A.

Does chapter 119 offend the ban against Church-State union? We discussed above the relation between an

opportunity for surcease from routine pursuits and the public health, safety, morals and welfare. We have pointed out that Sunday statutes prohibiting the pursuit of one's regular calling have generally been found to be devoid of religious orientation. The challenge to chapter 119 is far less substantial, for chapter 119 cannot be identified in its operative provisions with any sectarian tenet. We know of no religious order which limits its edict against Sunday activity to the sale of the five categories of items prohibited by chapter 119.

The sole basis on the face of the act for a Church-State challenge is the reference in the title to "the observance of the first day of the week" and the statement in section 4 that the act shall be construed as an additional remedy "to secure proper Sunday observance." Plaintiffs stress the word "observance." But one speaks of "observance" of holidays, whether secular or sectarian. Although it probably is true that "observe" in conjunction with "Sunday" has a religious overtone, yet it is not necessarily so since to many Sunday is now a secular holiday. At any rate, this scant evidence cannot be held to stamp as religious a statute which in terms follows no sectarian line. The presumption of constitutionality does not yield so easily.

It is true that Sunday legislation was advocated by individuals who, forgetful of the history of the subject, thought it proper for the State to support their own religious dogma. But the validity of a statute does not turn upon the validity of citizen pleas for its adoption. Nor, for that matter, can the Judiciary probe the thinking of legislators themselves. *N. J. Restaurant Assn. v. Holderman, supra* (24 *N. J.,* at *page* 301). If a legislator votes for a measure to further some undisclosed, invalid purpose, he is accountable to his conscience alone. The Judiciary may not interfere with the exercise of lawful power upon the assumption that a wrongful purpose caused it to be exerted. *McCray v. United States,* 195 *U. S.* 27, 54, 24 *S. Ct.* 769, 49 *L. Ed.* 78, 95 (1904).

## B.

Plaintiffs also urge the statute seeks to protect the city merchant against his highway adversary. Defendant in fact filed voluminous affidavits expressing the expert opinion that Sunday selling jeopardizes urban business and the value of real property ratables in established shopping centers. Plaintiffs seek to invoke the principle that the police power may not be used to restrain competition merely for the private advantage of a particular group. *Moyant v. Paramus,* 30 *N. J.* 528, 545 (1959); *Gundaker Central Motors v. Gassert,* 23 *N. J.* 71, 83 (1956), appeal dismissed 354 *U. S.* 933, 77 *S. Ct.* 1397, 1 *L. Ed. 2d* 1533 (1957); *Reingold v. Harper,* 6 *N. J.* 182, 192 (1951); *N. J. Good Humor, Inc. v. Bradley Beach,* 124 *N. J. L.* 162, 168 (*E. & A.* 1940). But of course competition may generate problems affecting the well-being of society, and if the hurt warrants legislative intervention to protect the public interest, it is of no consequence that the solution concurrently redounds to the private benefit of some. *Nebbia v. New York,* 291 *U. S.* 502, 525, 54 *S. Ct.* 505, 78 *L. Ed.* 940, 950 (1934); *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 *U. S.* 412, 425–426, 57 *S. Ct.* 772, 81 *L. Ed.* 1193, 1201 (1937); *cf. Breard v. Alexandria,* 341 *U. S.* 622, 626–627, 632–633, 71 *S. Ct.* 920, 95 *L. Ed.* 1233, 1239, 1243 (1951).

However, we are not called upon to consider whether chapter 119 is sustainable if the objective were thus economic. The reason is that we have no way of knowing that such was the purpose. The statute itself does not reveal it expressly or by necessary implication, and the fact that economic interests advocated legislation and that defendant introduced affidavits upon that theme does not demonstrate the Legislature was thus motivated. *Gundaker Central Motors v. Gassert, supra* (23 *N. J.,* at *page* 83). The act being within the police power upon the thesis discussed in "C" immediately below, *to wit,* to protect the health, safety, morals and welfare from unreasonable interference with the

opportunity of the public to find relief from everyday tensions, there is no need or warrant to debate the sufficiency of conjectural objectives.

## C.

We have already described the evil to which the earlier Sunday legislation was addressed. The *Constitution*, of course, does not confine the Legislature to that conception of the evil. The Legislature may take a different view of the scene and find the evil to be an impairment of public health, safety, morals and welfare, not because of the impact of uninterrupted labor, but rather because of unreasonable interference with the efforts of the vast majority of the citizens to find surcease from the pressures of the work week on the day generally selected by them for that purpose. Such is the conception of the evil which reasonably may be inferred from the title and terms of chapter 119.

The reasonableness of the classification of what may and may not be sold must be judged in the light of that conception of the evil. Upon that basis, classifications may be made which would be inadmissible where the purpose is to compel a day of rest. The legislative body may upon that approach classify operations upon such considerations as the amount of traffic, noise, or other bustle, and weigh those factors against, not necessity or charity, but rather relative utility or convenience to the public. See *Hertz Washmobile System v. South Orange, supra* (41 *N. J. Super.*, at *pages* 122–123).

Here the broad power to classify discussed in *Holderman, supra* (24 *N. J.*, at *pages* 300–305), comes into play. In the absence of a compelling showing to the contrary, we must assume, as the facts may reasonably be, that the Legislature found the items dealt with by chapter 119 are the ones which, above and beyond all others, are provocative of the problem; that the elimination of their sale on Sunday will remove the undue interference with the opportunity of

the citizens for relief from the stress of everyday pursuits. Upon the stated thesis, the Legislature may indeed hit the evil where it is felt most in its quest for a reasonable balance of the interests involved. It may, as it did in *Gundaker Central Motors v. Gassert, supra* (23 *N. J.* 71), thus proceed in a single field, the sale of automobiles, without compulsion to search out the evil everywhere. *Cf. Amodio v. Board of Commissioners of W. New York*, 133 *N. J. L.* 220 (*Sup. Ct.* 1945). It may, as in the case of chapter 119, attack the problem in a wider sphere if it finds the evil there warrants legislation in the public interest. The Legislature may proceed experimentally, cautiously, step by step, until it finds the solvent. We must uphold a classification unless it is plainly demonstrated to be capricious. The required showing is not made merely by contrasting items which may and may not be sold. The relative utility of such items may be wholly unrelated to the degree of Sunday activity which their sale incites and to the relief which a ban upon them will accomplish. Nor would it be fatal if incongruities or problems of construction should develop in fringe areas. The *Constitution* does not demand mathematical perfection. *Boyce Motor Lines v. United States*, 342 *U. S.* 337, 340, 72 *S. Ct.* 329, 96 *L. Ed.* 367, 371 (1952).

It is worth repeating that the Judiciary is not concerned with the good sense of a statute. Policy matters are the exclusive responsibility of the legislative branch of government. A judge, as a private citizen, may express his opinion at the polls, as every member of this court had the opportunity to do when chapter 119 was on the ballot. But the issue now before us is wholly one of the power of the Legislature to act, and upon that inquiry a judge would usurp authority if his personal view of policy intruded upon his deliberations.

### D.

Hence the trial court properly denied plaintiffs' motion for summary judgment. The proofs advanced did

not overcome the presumption of constitutionality. However, we think it was error to grant defendant's motion for judgment on the pleadings. For the purpose of that motion, the allegations of the complaint that the classification in fact is arbitrary and denies equal protection must be accepted as true. *Ridgefield Park v. Bergen County Board of Taxation*, 31 *N. J.* 420, 425 (1960). The parties carefully stipulated that defendant's affidavits would not apply to defendant's motion. It may indeed be difficult for plaintiffs to maintain their heavy burden of proof but they may not be denied an opportunity to try.

## IV.

The remaining issues relate to the referendum provisions of chapter 119.

### A.

Section 5 provides the act "shall take effect immediately but shall not become operative in any county unless and until the voters of the county shall determine by referendum held pursuant to this act that the same shall apply therein."

This, it is first urged, constitutes an unauthorized delegation of the legislative power. Plaintiffs approach the problem from several directions.

One phase of the attack presupposes that chapter 119 depends upon and provides enforcement for the 1951 revision. Upon that approach, plaintiffs say the Legislature undertook to leave to local decision the question whether an established state-wide policy of illegality shall be enforced locally. If the premise were correct, the referendum would be an odd one. Indeed the unusual character of such a referendum and the constitutional problem which it may present simply buttress the conclusion we have already reached that chapter 119 superseded the policy of the revision. We therefore need not consider the issue in those terms.

Rather the issue is whether the Legislature may leave to local option the question whether the provisions of chapter 119, an independent statute with a self-contained policy, shall be operative in the several counties.

The subject of referenda has a long history in this State. It would serve no purpose to review the merits of the conflicting positions fully debated in earlier cases. *Paul v. Gloucester County*, 50 *N. J. L.* 585 (*E. & A.* 1888); *In re Petition of Cleveland, Mayor*, 52 *N. J. L.* 188 (*E. & A.* 1889); *Warner v. Hoagland*, 51 *N. J. L.* 62 (*Sup. Ct.* 1888); *Michaelson v. Wall Township*, 92 *N. J. L.* 72 (*Sup. Ct.* 1918). Suffice it to say that the validity of that technique was well established under the *Constitution of* 1844 and nothing in the *Constitution of* 1947 casts doubt upon it.

As we understand plaintiffs, they argue the operative effect of a statute may be left to local decision only if the subject matter is one of local as distinguished from state-wide concern. They cite *Wagner v. Newark*, 24 *N. J.* 467, 478 (1957), for the proposition that certain matters are inherently reserved for the State alone (actually the rent control law there involved had a provision for local option; see *Jamouneau v. Harner*, 16 *N. J.* 500, 517 (1954), *cert.* denied, 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955)). Granting the limitation which plaintiffs suggest, we find no impediment to the act before us. Although it may be argued that if compulsory rest is the basis for legislation, the problem is of uniform concern throughout the State, yet certainly on the thesis we have found in chapter 119, local differences may well exist in terms of the *quantum* and nature of the activity and its impact upon the opportunity for relief from the regular routine. It is generally held that municipalities may be empowered to deal directly with the subject. *Auto-Rite Supply Co. v. Woodbridge Twp.*, *supra* (25 *N. J.*, at *page* 193); 50 *Am. Jur., Sundays and Holidays*, §§ 6 and 7, *pp.* 804, 805; 6 *McQuillin, Municipal Corporations* (3d ed. 1949), § 24.189, *p.* 768. We see no constitutional reason why the subject is inappropriate for

local decision by referendum. We must assume the Legislature, in its discretion, found a reasonable basis for local preference.

And it does not matter that the Legislature selected the county rather than the municipality as the unit for popular expression. The reason doubtless is the fact, to which we alluded earlier, that the problem transcends municipal lines. The county was the unit selected in *Paul v. Gloucester County, supra,* in which the constitutional problem was explored at great length. See also *Noonan v. County of Hudson,* 52 *N. J. L.* 398 (*E. & A.* 1890). Nor do we see any constitutional difficulty in the fact that the statute visits penal consequences upon a violation, making it a disorderly persons offense. For example, the statute in *Paul v. Gloucester County, supra,* denounced a violation as a misdemeanor. See *Michaelson v. Wall Township, supra* (92 *N. J. L.,* at *page* 78).

Lastly plaintiffs say if the Legislature directly legislated a prohibition in less than all of the counties, the law would be a special one within *Art.* IV, § 7, *par.* 9 of the *State Constitution* and a denial of equal protection of the laws and hence the same result may not be achieved by a statute dependent upon local option for operative effect. The same objection was fully considered and rejected in *Paul v. Gloucester County, supra* (50 *N. J. L.,* at *pages* 607–609) and *Jamouneau v. Harner, supra* (16 *N. J.,* at *page* 521); *cf. Wagner v. Newark,* 42 *N. J. Super.* 193, 214–215 (*Law Div.* 1956), reversed on other grounds, 24 *N. J.* 467 (1957).

B.

Section 7 prescribed the question to be placed upon the ballot in these words, "Shall the Sunday Closing Law (*P. L.* 1959, c. 119) apply within this county?" Plaintiffs first say that a "Yes" vote might have meant to some that Sunday selling shall be permitted and a "No" vote the

opposite. We cannot strike down the result of an election by assuming linguistic shortcomings in the electorate and a hypothetical confusion mounted upon that assumption.

More impressive is the further claim that "Sunday Closing" was an inaccurate description. Plaintiffs say "Sunday Closing" means *complete* closing rather than a partial one, and hence the affirmative may have received support which would have gone the other way if the limited scope of the prohibition had been stated. No doubt the question was not a model of clarity. Far more informative would have been a description revealing that the ban was limited to the sale of certain commodities. Yet "Sunday Closing" does not necessarily mean that everything is shut down. Surely no one would question the description if the act left necessitous work and recreations untouched. A law closing barber shops on Sunday would fall within the generic term of a "Sunday Closing" law as that term is generally used. Hence we cannot assume a purpose to mislead the voters or confidently infer that they were in fact misled.

At any rate, we are satisfied the objection comes too late. The time to protest is before the election, and not, as here, after the event. Elections are solemn events of tremendous public significance. We recently reiterated that in the absence of malconduct or fraud a concluded election will not be voided for an irregularity in the ballot unless it can be said that in all human likelihood it interfered with the full and free expression of the popular will and thus influenced the result. *In the Matter of the Alleged Error in the Preparation of the Ballot for the Recall Election in the City of Hackensack, 31 N. J. 592 (1960).* The facts do not satisfy that test.

## C.

The remaining question is whether it was arbitrary to provide for a referendum on a petition signed by 2,500 registered voters of a county rather than by a fixed per-

centage of the total voters in the county. It is not contended the number is too high. Rather the point is that it is low in the more populous counties and more exacting in the smaller ones. In that sense, it is charged to be discriminatory. But the legislative approach cannot be said to be arbitrary because another approach may strike one as more logical. The *Constitution* does not demand only the soundest, the wisest, and the best. Poor judgment is not the test of invalidity. We can find nothing invidious in the legislative decision and no breach of any constitutional barrier. Moreover, again, this is the kind of objection which does not go to the fairness of the expression of the popular will and hence is wholly unattractive when first urged after the election has been held.

## V.

We accordingly conclude that the presumption that chapter 119 is constitutional was not overcome and hence the trial court properly denied plaintiffs' motion for summary judgment. That order is therefore affirmed. But as we pointed out in III D above the trial court should not have granted defendant's motion for judgment on the pleadings. Such a motion assumes the truth of the allegations in the adversary's pleadings, here the allegation in the complaint that the statutory classification is arbitrary and denies equal protection of the law. Plaintiffs are entitled to proceed to a trial of that issue. The order granting that judgment is therefore reversed, and the matter remanded for further proceedings not inconsistent with this opinion. Costs to abide the event.

BURLING, J. (concurring). I concur in the result reached in the opinion filed by Mr. Chief Justice WEINTRAUB. I consider it appropriate to file this general statement of my views in this matter.

Considered as a supplement to *N. J. S.* 2A:171–1—the basic Sunday Closing Law enacted as part of the 1951

revision—the act in question, *L.* 1959, *c.* 119, is unconstitutional. So considered, the 1959 law must be reasonably related to the ends sought to be achieved by *N. J. S.* 2A:171–1, *i. e.,* to "provide an escape from the market place for merchant and customer alike." *Auto-Rite Supply Co. v. Woodbridge Twp.,* 25 *N. J.* 188, 192 (1957). In the *Auto-Rite* case, I had occasion to point out, in another context, but nevertheless by way of applying the same principle applicable in the instant litigation at this point, that an ordinance prohibiting the Sunday sale only of certain enumerated items could not exist in harmony with the general state policy of overall Sunday closing. It was there held that the limited scope of the ordinance in question "makes a sham of the declared title and purpose to be served," *i. e.,* the end of achieving a general day of rest. *Auto-Rite Supply Co. v. Woodbridge Twp., supra,* at *page* 196. In the same manner that the ordinance involved in the *Auto-Rite* case could not be said to be reasonably related to the State policy of overall Sunday closing and hence in violation of that policy, the statute in question here, *L.* 1959, *c.* 119, cannot be said to be reasonably related to the purposes sought to be achieved by it, by hypothesis the same purposes to which *N. J. S.* 2A:171–1 is directed, and hence violates the constitutional provision that legislative classification must bear a reasonable relation to the purposes of the legislation in which they are contained. *New Jersey Restaurant Ass'n v. Holderman,* 24 *N. J.* 295, 300 (1957). Assuming, therefore, that the 1959 law is but a supplement to the 1951 revision, the former must fall as not being reasonably related to the purposes of its enactment.

That the 1959 law cannot be sustained as tending to fulfill the purposes of *N. J. S.* 2A:171–1 indicates, however, that in fact the Legislature has discarded the policy of the latter act and substituted in its place another policy, radically different from the first. On one hand, the effect of *N. J. S.* 2A:171–1 *et seq.* was to preclude all "worldly employment or business" with certain exceptions stated in

the act and others permitted by referendum within a municipality, whereas, on the other hand, the present statute only proscribes the sale of five general types of goods. Such a difference in effect may be attributed logically only to a difference in underlying policy, a difference which naturally leads to the conclusion that the prior act has been repealed by implication. The remaining question, therefore, is whether *chapter* 119 of the *Laws of* 1959 may stand, as isolated, against the charge that it violates the equal protection of the law.

A parenthetical note is in order at this point. That the Legislature intended to repeal *N. J. S.* 2A:171-1 *et seq.* does not imply that all municipal ordinances affecting Sunday closing are henceforth contrary to state policy. The power of municipalities to act in this field exists not by virtue of *N. J. S.* 2A:171-1 *et seq.,* but by *R. S.* 40:48-2, the omnibus provision of the Home Rule Act. It is apparent, therefore, that this decision in no manner affects existing or future municipal Sunday closing ordinances; in fact, it eliminates the restrictive effects which the state statute imposed on those ordinances. *Auto-Rite Supply Co. v. Woodbridge Twp., supra.* Whether *L.* 1959, *c.* 119, or *L.* 1959, *c.* 131 imposes another restrictive policy on municipalities regarding Sunday closing must remain unanswered, however, until litigation presents the issues to this court.

It is my view that chapter 119 of the *Laws of* 1959 is not void on its face for failure to provide the persons affected by it with the equal protection of the laws. There is no apparent economic hardship imposed on the vendors of the articles the Sunday sale of which is proscribed by the statute inasmuch as the demand for the specific items cannot to any appreciable degree be satisfied elsewhere since all such vendors within the area of the geographical effect of the statute are prohibited from selling the desired articles. *Cf. Gundaker Central Motors v. Gassert,* 23 *N. J.* 71 (1956). That it might be more profitable for the affected vendors to locate outside the area in which the statute has effect

is of no importance in considering the constitutionality of the act. And it is not apparent on the face of the statute that it is not a reasonable means of achieving a valid legislative goal: to free the highways from traffic caused by commercial activity to an extent sufficient to allow their unobstructed use by persons seeking relaxation.

The *Auto-Rite* case, *supra*, is not to the contrary. In that case, the ordinance prohibiting the Sunday sale of certain enumerated goods was required to be related to the state policy of overall Sunday closing. So related, the ordinance could not stand. In the instant case, however, the statute in question need not be sustained on the presumption that it is intended to secure a general day of rest through inactivity. Indeed, chapter 119 will be sustained if it is reasonably related to any valid legislative purpose, and, as stated above, such would appear to be the situation in the instant case.

FRANCIS, J. (dissenting).

" 'When I use a word,' Humpty Dumpty said, 'it means just what I choose it to mean, neither more nor less.'

'The question is,' said Alice, 'whether you can make words mean so many different things.' .

'The question is,' said Humpty Dumpty, 'which is to be master— that's all.' " *Lewis Carroll, Alice in Wonderland* and *Through the Looking Glass* (*Grosset & Dunlap*, 1946) *pp.* 239, 240.

My colleagues of the majority have outdone Humpty Dumpty. By a process of judicial legerdemain, they have caused words in *L.* 1959, *c.* 119 (*N. J. S. 2A* :171–5.8 *et seq.*) to disappear entirely. Having accomplished that feat, they then proceeded, by flicking a magical super-legislative wand, to repeal the basic Sunday Closing Law, *N. J. S.* 2A :171–1, 2 and 6–12, whose existence, in substantially similar form, traces back in New Jersey to 1675. During the intervening years—almost 300—that legislation, although revised to some extent in more recent times, has survived many direct attacks and attempts at repeal. In the pursuit

of what it conceived to be its public duty, the Legislature, to which the lawmaking power has been assigned under the *Constitution,* has always rejected those efforts. Now comes our court with a declaration that the Legislature did indirectly and by implication what it has refused to do directly over all those years. I do not have the slightest doubt that the decision constitutes a clear usurpation of the authority of that body. Nor do I doubt that of all the persons interested in this proceeding, the members of the Legislature will be the most astonished upon learning that they intended to repeal and did repeal the basic statute by supplementing it and by providing an additional remedy in aid of its enforcement.

But there is more than this. As the effect of the magic further diffuses itself, as Alice said in Wonderland, things get "curiouser and curiouser." With the adjudged repeal of the basic statute, the new enactment, *L.* 1959, *c.* 119, which was expressly called a "Sunday Closing Law" by the Legislature, has been metamorphosed into a Sunday opening law. The old statute is now out of existence. Every phase of commercial and industrial activity may be engaged in on Sunday without legal restraint, excepting only the sale of the five items banned in the 1959 act, *i. e.,* clothing or wearing apparel, building and lumber supply materials, furniture, household and office furnishings and appliances. And, in the counties where there was no referendum or the restriction was voted down, presumably the court's intention is that no limitation at all exists any longer.

It may be useful at this point to note specifically that the 1959 measure does not cover the manufacturing and construction industries, in which 46.9% of the New Jersey labor force is employed. See, *Flink and Others, The Economy of New Jersey, A Report Prepared for the Department of Conservation and Economic Development of the State of New Jersey* (1958) 139. It does not include the 10.2% who work in the service industries; nor does it affect all of the 17.8% of New Jersey labor which is

employed in wholesale and retail trade. It omits many kinds of retail stores engaged in the sale of a multitude of items now freed for Sunday disposition. The *Statistical Abstract of the United States* (1958), *Bureau of the Census, Washington, D. C., pp.* 836, 837, reveals that in the entire United States less than half of those employed in retail establishments work in clothing, building materials, furniture, and appliance stores—the only ones within the statutory category. Thus, it may be estimated that only approximately 8.9% of the New Jersey labor force are subjected to the Sunday ban. And on recalling that the referendum as to whether the 1959 act should apply in a particular county appeared on the ballot in only 15 out of our 21 counties, and that it failed of adoption in three of them, it becomes obvious that the percentage of workers affected is even less than 8.9%. Consequently, the prescribed day of rest is provided for these relatively few workers because their employers cannot sell articles in the five categories specified. No one disputes that prior to 1959 there were violations of the long-existing Sunday Closing Law and that enforcement officials closed their eyes to them. Nor can it be denied that in the past few years there has been an upsurge in Sunday business activities. It is equally plain that the vast majority of citizens respected and observed the law and took advantage of the day as one of rest and relaxation. To open the floodgates for business activity as this court has done under the guise of enforcement of an implied legislative will reduces all conceptions of Sunday as a day of rest to a mere shadow.

The history of Sunday closing regulation appears in the Chief Justice's opinion and need not be repeated in detail here. However, some additional comments seem necessary. As noted there, the first comprehensive legislation after the Revolution was enacted in 1798. *Paterson's Laws* (1800) 329, *et seq.* It *expressly repealed* all prior laws on the subject. Section 21. A few amendments were adopted thereafter down to 1919 when Justice Minturn of the former

Supreme Court delivered an address suggesting changes. None was made. The 1926 Commission referred to in the opinion of the Chief Justice proposed changes, and bills were introduced to accomplish them. None passed. The revisors of the entire body of statutory law of the State in 1937 preserved the existing act with but a few changes in wording. The Legislature approved. *R. S.* 2:207–1 to 30. The Advisory Committee on Revision of Statutes created by the lawmakers in 1951 to revise Title 2 of the *Revised Statutes,* recommended that chapter 207 be deleted entirely, saying, "Repeal, obsolete." *Revision of Title 2, Tentative Draft, Part* I. Again the Legislature declined. Chapter 207 was rewritten in much more concise form and incorporated as *N. J. S.* 2*A*:171–1 *et seq.* Section 1 said:

"No worldly employment or business, except works of necessity and charity, shall be performed or practiced by any person within this state on the Christian Sabbath, or first day of the week, commonly called and hereinafter designated as Sunday."

The penalty clause was not re-enacted.

Subsequent efforts to bring about changes met with no success until the adoption of *chapter* 138, *L.* 1958. That enactment prohibited the very same categories of sales as does the act under consideration. Its application being limited to 18 of the 21 counties, it was declared unconstitutional. *Sarner v. Union Tp.,* 55 *N. J. Super.* 523 (*Law Div.* 1959). · The format of that statute was identical with the present one except for exclusion of the three counties and the addition in *chapter* 119, *L.* 1959, of the referendum provisions. It too was a "supplement" to the old act and it too was required to be "construed as an additional remedy."

The above historical material is admittedly somewhat repetitive of the majority opinion. But the emphasis is different. The purpose is to point to the profound reluctance on the part of the Legislature to wipe out the basic Sunday prohibition against worldly employment. It is also designed to bring to attention that no public problem could

have been more in the consciousness of the lawmakers in recent years than this one. Elaborate hearings were held at Trenton and protagonists of a wide variety of views were heard. To say that in such an atmosphere in 1958 and 1959, if the Legislature had formulated an intent to repeal the old law, it would have left the matter to implication rather than express language, is unrealistic to say the least.

Let us consider then the startling conclusion of the majority. This must be done against a background of fundamental tenets of statutory construction. The sole constitutional function of the judicial branch of the government in this area is to interpret in accordance with the plain language of a statute and not some supposed unexpressed intention. There is no authority to legislate. *Dacunzo v. Edgye,* 19 *N. J.* 443, 451 (1955). We are required to assume that the Legislature knows the existing statutory law and the judicial decisions interpreting it. When new regulations are adopted, the Legislature is presumed to have envisioned the whole body of law and to have acted with regard to it. Consequently, a cardinal doctrine is that if repeal of an existing statute is intended, the lawmakers should expressly say so rather than leave that result to implication. For that reason, it has come to be traditional to refuse to recognize an implied repeal of an earlier law by a later one unless the intention of the Legislature to produce that result appears beyond a reasonable doubt. And it may be added that the rule has special application to public statutes of long standing. *State v. Federanko,* 26 *N. J.* 119 (1958); *Swede v. City of Clifton,* 22 *N. J.* 303 (1956); *Asbury Park Press v. City of Asbury Park,* 19 *N. J.* 183 (1955); *Yarn v. City of Des Moines,* 243 *Iowa* 991, 54 *N. W.* 2d 439 (1952); 1 *Sutherland, Statutory Construction* (3d ed. 1943), §§ 2012, 2015, 2033; 50 *Am. Jur., Statutes,* § 546.

After referring to the establishment of penalties for sale of the enumerated items, the title of *chapter* 119, *L.* 1959, specifically says "* * * and *supplementing chapter* 171 of *Title* 2A of the *New Jersey Statutes.*" (Emphasis added.)

A supplement to an act by its very character is a complement to its antecedent—the original act. *Edwards v. Stein,* 94 *N. J. Eq.* 251, 258 (*Ch.* 1922). As far back as 1892 this was recognized. According to Chief Justice Beasley:

"Supplements to laws, from their very nature, must, either by expression or implication, refer to their antecedents, to whose scheme they are designed as complements; and all legislation, since the establishment of the amended constitution of the state, has been constructed on this theory." *Bradley & Currier Co. v. Loving,* 54 *N. J. L.* 227, 228–229 (*Sup. Ct.* 1892).

It would be idle to suggest that the legislators who voted for the law under discussion were not completely aware of the connotation of "supplement" when they used it. There is nothing in the language of the entire chapter to demonstrate beyond reasonable doubt that they used it as an incident of an intention to repeal the old Sunday law by implication.

If there is any lingering doubt on the subject, other provisions eradicate it. Section 4 (*N. J. S.* 2A:171–5.11) says:

"This act shall be construed as *an additional remedy* to secure proper Sunday observance and the directors, officers, managers, agents or employees of corporations shall be personally liable for the penalties hereinabove provided." (Emphasis added)

No one needs assistance as to the significance of "an additional remedy." Note that the Legislature did not simply say: "This Act shall be an additional remedy." It told the Judiciary, whose duty it would be under our tripartite system of government to interpret the act, to *construe* it as an additional remedy. But the effect of the majority opinion is to empty all those words of any significant content, and hold them to be consistent with a legislative intent to repeal the act to which they were to constitute an addition.

What *did* the Legislature intend to include as an addition or a complement? It was aware, of course, that the 1951 revision of the old act failed to include specific penalties

in aid of enforcement. Putting aside for a moment the question whether absence of a penalty clause renders enforcement impossible, as the majority seem to suggest, the significance of the inclusion of "an additional remedy" in 1959 is brought into sharp focus. The lawmakers, for reasons with which the Judiciary cannot concern itself, intended to impose an additional specific penalty on merchants who sold any of the five designated items on Sunday. Such violators are declared to be disorderly persons and subject to a fine of $25 for the first offense; not less than $25 nor more than $100 for the second; not less than $100 nor more than $200 or, in the discretion of the court, 30 days in jail nor both, for the third; and for the fourth or each subsequent offense, not less than $200 nor more than $500 or, in the discretion of the court, not less than 30 days nor more than six months in jail or both. Each single sale to any one customer is constituted a separate and distinct violation. And "in addition" to the stated penalties upon any four convictions the premises upon which the violation occurred must be deemed a nuisance. *N. J. S.* 2*A*:171–5.8, 5.9. The opinion of the majority says that these penalties are not an additional remedy because the 1951 revision is a "toothless declaration" and so no remedy existed for violation of that act. Here again the court puts aside basic principles although the Legislature obviously was aware of them. Long prior to 1951 frequent violators of the Sunday Closing Law were indictable and punishable as operators of a disorderly house. Our former Supreme Court so held in *State v. Reade,* 98 *N. J. L.* 596 (*Sup. Ct.* 1923). Of particular interest is the statement of the court there that such a conviction may be had even though a single violation would not constitute that crime. Over 60 years earlier, the same ruling had been made. *State v. Williams,* 30 *N. J. L.* 102 (*Sup. Ct.* 1862). The *Williams* case was described in 1880 by the Court of Errors and Appeals as representing "the unchallenged law of this State." See, *Meyer v. State,* 42 *N. J. L.* 145, 157 (*E. & A.* 1880). My research shows that the rule

still occupies the same pristine status, unless the present statement in the Chief Justice's opinion that "We cannot find a reasonable basis for the disorderly house approach," is meant to impliedly overrule these old precedents. Apparently in earlier days no doubts were held on the subject at the enforcement level, witness Judge Depue's charge to the Grand Jury of Essex County in 1887 in a situation involving the sale of liquor on Sunday. He said, among other things:

> "A disorderly house is defined in law to be a place where illegal practices are habitually carried on. By force of judicial decisions in this state, a place comes within the category of a disorderly house by reason of the habitual violations of law, although such habitual violations of the law are simply infractions of the laws regulating the sale of liquor, and although indictments will not lie for the specific acts of selling." 10 *N. J. L. J.* 116, 118 (*O. & T.* 1887).

My colleagues suggest that the Legislature would be startled to learn that Sunday selling might be prosecuted by such an indictment with its possible statutory punishment of a maximum of three years imprisonment and $1,000 fine. I doubt it. Legislators are presumed to know the law and the availability of the remedy of disorderly house prosecution was specifically commented on in Justice Heher's dissent in the recent Sunday closing case in this court, *Auto-Rite Supply Co. v. Woodbridge Twp.,* 25 *N. J.* 188, 201 (1957), decided just 14 months prior to the adoption of *L.* 1958, *c.* 138, the substantial prototype of the present 1959 Act. Further, upon conviction under this type of indictment, the sentencing judge is invested with even more discretion than he is given under the 1959 law. He may suspend sentence, place the offender on probation, or fine him from $1 to $1,000, or he may impose a jail term of one day to three years. On the other hand, the new supplement fixes a mandatory minimum fine graduating upward with repetition of the offense, although a jail sentence is discretionary.

Moreover, criminal proceedings are maintainable against persistent Sunday sellers under *N. J. S. 2A*:130–1. Under

that statute, "Every building or place where the law is habitually violated is a nuisance." In *State v. Berman,* 120 *N. J. L.* 381 (*Sup. Ct.* 1938), the *Williams* case, *supra,* was cited as authority to support a conviction thereunder.

Again, the plain indication from *Mayor, etc., of Alpine Borough v. Brewster,* 7 *N. J.* 42 (1951), is that the civil remedy of injunction is also available to proper parties to halt repeated infractions of the basic 1951 act.

As the result of these cases and the statute referred to, it is inconceivable that when the expression "additional remedy" was written into the 1959 act, the Legislature did not mean it or that it was part of an unexpressed intention to repeal the 1951 act. It is likewise impossible to conceive of that term as being consistent with an implied intention to repeal the latter statute.

Additional persuasive proof against the finding of implied repeal is easily discoverable. Section 5, *N. J. S.* 2A:171–5.12 provides that the 1959 act shall not become operative in any county until the voters thereof adopt it by referendum. Thus, if the question does not go on a county ballot or if it is defeated by the people after being placed thereon, the specific mandate of the Legislature is that the statutory ban on Sunday sales of the five items is not operative. Section 8 (*N. J. S.* 2A:171–5.15) specifically ordains that "if a majority of all such votes shall be cast against the question, the provisions of this act shall remain inoperative in such county." Can it possibly be said that a statute which, by the solemn and express order of the lawmakers, is not applicable at the present time in nine counties of the State was intended by them to impliedly repeal the underlying Sunday Closing Law?

It cannot be overlooked that the Legislature had strong reason to believe that additional sanctions for particular violations were proper, that the new act would not operate as an implied repealer of the old one, and that if repeal was desired, express language to that effect ought to be employed. The precise question was raised in *West Orange v.*

*Jordan Corp.*, 52 *N. J. Super.* 533 (*Cty. Ct.* 1958). There the argument was advanced that the 1958 act, which it must be remembered took effect immediately and was not contingent upon a favorable referendum result, was intended to impliedly repeal the basic Sunday law. The contention was rejected, the court saying:

"A comparison of the two statutes leads to the conclusion that this argument is without merit. *Chapter* 138 of the *Laws of* 1958 states specifically in its title that it is a supplement to *chapter* 171 of *Title* 2*A* of the *New Jersey Statutes*. It inserts in the latter statute an entirely new section, which bears the number 5.1. The prior statute had no section thus numbered. Further, the new act does not in any way limit or circumscribe the provisions of *chapter* 171 of *Title* 2*A*, but merely provides penalties if sales are made on Sunday of those items of merchandise specifically enumerated in the 1958 act. *N. J. S.* 2*A*:171-1 *et seq.*, contains no penalty provisions and perhaps the Legislature, in dealing with the items enumerated in *L.* 1958, *c.* 138, believed that these items required special treatment and therefore imposed specific penalties for the sale of such items on Sunday. It has done this with respect to other items of merchandise; for example, the sale of new and used automobiles. See, *N. J. S.* 2*A*:171-1.1; *Gundaker Central Motors v. Gassert*, 23 *N. J.* 71 (1956), appeal denied 354 *U. S.* 933, 77 *S. Ct.* 1397, 1 *L. Ed.* 2*d* 1533. The most that can be said is that the Legislature decided specifically to interdict the sale of certain items of merchandise but not to change public policy with respect to the sale of other merchandise. The enumerating of specific items in the statute should not be construed as exempting from the provisions of the Sunday closing statute all other business, in the absence of some clear legislative expression to that effect. There is no such intent apparent in the statute." 52 *N. J. Super.* at *page* 539.

True, the quotation is drawn from the opinion of the trial court from which no appeal was taken. It may not be amiss to say, however, that during the short tenure of that judge, he proved himself to be worthy of the bench. Shortly thereafter the same court again ruled against the claim of implied repeal. *West Orange v. Carr's Department Store*, 53 *N. J. Super.* 237, 248 (*Cty. Ct.* 1958). These two cases were decided a month apart, the second one about six months prior to the adoption of chapter 119. It is extremely unlikely that the members of the Legislature were unaware

of these holdings that the general Sunday sales ban was not abrogated by their latest enactment.

Further in this connection, when *chapter* 138 of the *Laws of* 1958 was signed by the Governor, he not only expressed some doubts as to its constitutionality (which subsequently proved to be well taken) but he also said:

"This bill was enacted without any indication what effect it shall have on existing laws on the same subject. In the course of amendment, it would be most desirable to clarify this phase of the matter." Governor's *Press Release*, Aug. 4, 1958, *p.* 4.

The judicial declaration of unconstitutionality followed (*Sarner v. Union Tp., supra*), and 40 days later *c.* 119, *L.* 1959 was enacted. In the face of the Governor's comments, if the legislators had any intention of repealing the old Sunday law they certainly would have expressly said so in the new act and not have left the matter to implication.

All of the considerations expressed above inexorably lead to the conclusion that the implied repeal found by the majority was not intended by the Legislature. Surely it cannot be said that in spite of all of the evidence to the contrary, such a repeal is demonstrated beyond a reasonable doubt. In my judgment, therefore, the general Sunday closing regulation, *N. J. S.* 2*A* :171–1, revision of 1951, was not affected by the 1959 law and remains in full force and vigor. Quite apparently the legislators were not thinking in terms of repeal, because four days before adoption of chapter 119 they passed chapter 131. The latter act specifically *amended* the basic Sunday observance law, 2*A* :171–2, to remove sale of perishable agricultural and horticultural products from the ban. Both bills were submitted to the Governor for signature. Chapter 119 was signed by him on June 17 and chapter 131 on June 18, without further comment as to any possible irreconcilable conflict between chapter 119 and the long-standing Sunday statute. No one would suggest that if implied repeal of *N. J. S.* 2*A* :171–1 *et seq.*, were in contemplation, there would

have been any possible need to expressly authorize sale of the products mentioned. Adoption of chapter 119 would remove all obstacles to their sale.

In reaching for the conclusion announced, the majority argues that irreconcilable policy conflicts appear between $2A$ :171–1 *et seq.* and the 1959 legislative expression. Those conflicts are more chimerical than real. The policy of the old act was and is to provide a day of rest on Sunday and to inveigh against all invasions of it except works of necessity and charity, sale of perishable agricultural and horticultural products (by virtue of the 1959 amendment) and certain other articles, if approved by local referendum. The majority opinion strains itself to demonstrate such an utter repugnancy between that policy and the aim of chapter 119 as to leave but one result, *i. e.*, that the Legislature intended repeal of the former by the latter. But their analysis in the ultimate led them to the conclusion that the purpose of chapter 119 in banning the sale of the five kinds of goods is to protect Sunday as a day of rest. Thus the statutes have a common, not a dissimilar, objective. It follows that the only difference is the addition of specific penalties which the Legislature felt should be imposed for the violations described.

As a closing word on this phase of the matter, mention must be made of another significant circumstance. The title page of the majority opinion lists the names of the numerous able counsel who appeared in various capacities in the proceedings. All of them furnished us with exhaustive briefs. Not a single one contended that chapter 119 had impliedly repealed the long-standing Sunday statute. In fact, the attorneys who dealt with the question argued without qualification that no implied repeal existed.

If the 1951 basic Sunday law has not been impliedly repealed, what is the status of *c.* 119, *L.* 1959, under discussion? It is unconstitutional and the majority opinion required little space to express that conclusion. Such result had to be reached because to select just these five retailers

and to subject them to penalties different from all other sellers of goods is clearly discriminatory and offends against the requirement of our organic charter for equal protection of the law. Unfortunately, my colleagues then turned their determination of unconstitutionality into a springboard for a declaration that the Legislature had an unexpressed intention to repeal the statute it was undertaking to complement. That result is bizarre because the proper explanation for the legislative difficulty and of the result that should follow, in my judgment, is very simple. The legislators just made a mistake. They believed it would be lawful to single out the dealers in question for additional and more specific penalties than those which, as has been indicated above, could be meted out to any other Sunday observance violator. But the cure for such a mistake is in the Legislature. That body alone has the constitutional power to correct it. The judicial branch of the government should not trespass in that area. It would be unsafe in our democratic society to permit the Judiciary, removed as it is from the electorate, to declare the repeal of a statute even though the judges might think it was unpopular, or not being enforced in some areas or because they might believe it to be unsuitable to existing economic conditions. 1 *Sutherland, supra,* § 2034. There is no tragedy in the present legislative error. Neither branch of government makes any pretense of infallibility and our co-equal should be allowed to decide upon the form the correction of its own errors should take.

## II.

In view of the agreement by the entire court that if the basic statute is not impliedly repealed, *chapter* 119, *L.* 1959, is invalid because the classification is unconstitutional on its face, no purpose will be served in further discussion of that subject. At this juncture, therefore, the case should end; a declaration of unconstitutionality should be made and the judgment of the trial court should be reversed.

## III.

The majority having validated an invalid statute by invalidating a valid one, it remains for the dissent to discuss whether the survivor of this alchemy, chapter 119 standing alone, is constitutional. The specific question that has emerged is: does chapter 119, considered in isolation, offend the equal protection clauses of the *Federal* and *State Constitutions?*

The opinion of the members of the majority accepts the motivating factor of chapter 119 as a desire to protect Sunday as a day of rest. Of course, if the basic statute has been impliedly repealed, for the first time in almost 300 years, New Jersey no longer has any express general legislative provision in aid of Sunday withdrawal from worldly employment. A day of rest is *ordered* only for those who are in the business of selling, or who are employed to sell, the banned goods, and then only if the enterprise is limited to dealing in them. Thus, the idea that chapter 119 is supportable as designed to protect a day of rest when it only partly closes the places which sell the specified items but permits the sale of a multitude of other articles there, and when it opens up all other types of commercial activity, contains within itself its own negation. To say that people who are now released for mundane pursuits are going to ignore their new license and seek only rest, recreation and relaxation, is sheer speculation. And to find support for discrimination against the five classes of goods in the idea that it may serve to strike at the evil of interference with Sunday tranquility where the evil is felt most, is to use gossamer threads for the purpose.

Even at the risk of laboring the point, further elaboration seems advisable. Sale of five classes of articles is prohibited: (1) clothing and wearing apparel, (2) building and lumber supply materials, (3) furniture, (4) home or business furnishings, (5) household, business or office appliances. All of these may be manufactured or processed in factories and

elsewhere on Sunday; only sale is banned. Likewise, all of the myriad other articles may be made, advertised and sold seven days a week. A few of them may be named: drugs, cosmetics, toiletries, perfumes, hair preparations, shaving equipment and supplies, automotive supplies and accessories, jewelry, clocks and watches, luggage and leather goods, optical supplies, school and stationery supplies, books, records, musical instruments, radios for automobiles but not for homes or offices, yard goods (to make clothing, drapes, etc., which in completed form cannot be sold), power and hand tools, fuses and power cords, garden tools, paint, power mowers, antiques, tobaccos, paper and paper products, machinery, metals, scrap and waste materials, magazines and newspapers, fuel, coal, oil, logs, ice, petroleum products, office machines, restaurant supplies, all varieties of food and food products, printing equipment, rope, medical and dental supplies, beauty and barber shop supplies, laundry supplies, upholstery supplies, seeds, farm and garden supplies, birds (but not bird cages), *etc.* All of the service businesses may be open, gasoline stations, repair shops, laundries, auto laundries, tailor shops, *etc.* Supermarkets in-town and on the perimeter highways are not required to close. Every form of worldly employment may be pursued except the sale of the condemned items. Houses, apartments, factory buildings may be constructed on Sunday so long as the materials do not have to be purchased on that day. Paint may be bought, however, and used on the buildings, of course, if paint brushes are available because the sale of them is outlawed. Affidavits of plaintiff, Two Guys from Harrison, Inc., assert that thousands of items are offered for sale in their various establishments and that the banned articles represent only a small percentage of those which may legitimately be disposed of on Sunday. The problem presented by chapter 119 cannot be looked at in a vacuum. It requires very little imagination to conjure up a picture of temporary picket fences around counters and sections of these large retail establishments, closing them

off from the Sunday buying public, with signs on them saying: "Sorry these articles cannot be sold but look across the aisle or at the many other open counters around."

To ban sale of the five classes of goods on Sunday is virtually to grant a public license to all other forms of commercial and industrial business to operate on that day. The statute lends community sanction and status, official recognition and actual financial advantage to the multiude of enterprises which are no longer restrained on the traditional day of rest and relaxation. The majority suggest that perhaps the individual municipalities will adopt their own Sunday ordinances and thus repair the breach now created. It is a matter of common knowledge that a delegation of unrestrained control, if taken advantage of at all by local governing bodies, would result in such heterogeneous ordinances, even within a single county, that only confusion and discrimination would result. At the very best (assuming the existence of the municipal authority), it would amount to the exchange of a hope for an established fact.

Considered in terms of constitutional doctrine, I believe that chapter 119 on its face is discriminatory and void. It is entirely inconsistent with our fundamental freedoms to single out the particular five classes of goods for Sunday prohibition and to select those who sell them for discipline and restraint, while at the same time releasing the overwhelming majority of other citizens to do as they please in the field of business on Sunday. The court expressed this basic thought through Justice Burling in *Auto-Rite Supply Co. v. Woodbridge Twp., supra*, 25 *N. J.* at *page* 196:

"Here the substance * * * makes a sham of the declared title and purpose to be served. The doors of the paint and wallpaper stores are closed but lumber supplies flow freely, all supposedly, in the interest of peace and quiet, rest and relaxation of all merchants and the purchasing public alike. The mere statement of the proposition demonstrates that the Woodbridge ordinance was not designed to serve the stated objective."

*Elliot v. State,* 29 *Ariz.* 389, 242 *P.* 340, 46 *A. L. R.* 284 (*Sup. Ct.* 1926), and *Gronlund v. Salt Lake City,* 113 *Utah* 284, 194 *P. 2d* 464 (*Sup. Ct.* 1948), are cited as examples of discriminatory regulation. Although those cases deal with arbitrary exclusions from a Sunday sales prohibition, they are analogous in principle here. They reveal clearly that in the absence of inherent differences (which are apparent to judges as reasonable men) between sales permitted and sales prohibited, and business places closed and those permitted to remain open, the classification is arbitrary and runs counter to the *Constitution.*

In *Gronlund* [113 *Utah* 284, 194 *P. 2d* 465], the ordinance made unlawful the sale of "any commodity upon the first day of the week, commonly called Sunday; excepting that foods may be sold to be eaten on the premises where sold; fruits and vegetables sold by the producer on the premises where produced; and drugs, medicines, surgical appliances; fresh milk; ice cream and soda fountain dispensations; candy and confections; bottled soft drinks; bread and bakery products; ice; gasoline and oil; tobacco and cigars; dentifrices and toiletries; newspapers and magazines; sporting equipment (but not including sports clothing); beer; nursery products, such as trees, shrubs, flowers, plants, and bedding plants; and parts and equipment for automobiles and other vehicles which are necessary to be installed for repair purposes on Sunday, may be sold."

The Supreme Court of Utah pointed out that the ordinance was not a general Sunday closing law but *only a limitation on mercantile pursuits in terms of certain commodities.* Thus, the effect was to allow such enterprises as banks, pawnshops and beauty parlors to function on Sunday, while closing many businesses devoted to the sale of commodities. Such a discrimination between services and commodities was held to be unreasonable. The court went on to say:

"Even bearing in mind the rule that the classification upon which a Sunday closing law is based is within the discretion of the legisla-

tive branch and hence will be upheld unless clearly arbitrary, it is difficult to conceive of a fair reason for some of the items excepted. It is readily apparent that some of the exceptions are clearly based on necessity. But as to others, even considering the desirability of promoting recreational activity on Sunday, no fair reason suggests itself as to why their sale should be permitted on Sunday while the sale of other commodities is prohibited. Neither sporting equipment nor nursery products are such from the standpoint of the buyer or seller that they cannot be purchased on a week day, though it is the intention of the buyer to use the equipment and plant the tree or flowers on a Sunday. Neither is likely to deteriorate over Saturday night or be depleted during Sunday. Boxing gloves and baseball bats are at least as staple as butter and bananas. The same may be said of dentifrices and toiletries, tobacco and beer. The classification being on a commodity basis, it is arbitrary to permit the sale of a can of beer on Sunday and prohibit the sale of a can of orange juice or a can of coffee." 194 *P.* 2d, at *page* 468.

In *Elliot* it was said that the Legislature "[m]ay not prohibit the exercise of businesses or occupations legitimate and lawful within themselves, which do not carry inherent reasons for special discrimination, while allowing general privileges to other similar occupations." And:

"[w]e cannot see why it is a legitimate discrimination to close groceries, shoe stores, and hardware stores, while allowing jewelers, dealers in second-hand goods, and tailoring establishments to remain open without restriction; nor does it appear on any theory we can conceive that pawnbrokers and photographers are engaged in works of necessity and charity when butchers and dealers in fruit or vegetables are not." 242 *P.*, at *p.* 342.

See also, *Deese v. City of Lodi,* 21 *Cal. App.* 2d 631, 69 *P.* 2d 1005 (*Dist. Ct. App.* 1937); *Chan Sing v. City of Astoria,* 79 *Or.* 411, 155 *P.* 378 (*Sup. Ct.* 1916).

As has been said, the result of the majority's decision is that the State no longer has a general law designed to set aside Sunday as a day of rest and relaxation. There is now no legislative recognition of any such day. No one is required to respect a citizen's desire to rest except so far as the criminal laws may impose such requirement for every day of the week. Chapter 119, the only remaining legislative regulation, is simply a prohibition against the sale of

certain commodities on that day. No place of business is required *to close down,* even the ones normally dealing in the banned goods; everyone else may manufacture, sell and service at will. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities. *Shelley v. Kraemer,* 334 *U. S.* 1, 22, 68 *S. Ct.* 836, 92 *L. Ed.* 1161, 3 *A. L. R. 2d* 441 (1948). There is no issue present in this case which calls for trial. Chapter 119 is so palpably arbitrary and discriminatory that it must be condemned as unconstitutional on the record now before us.

### IV.

To conclude, my view is that the basic Sunday closing statute, *N. J. S.* 2A:171–1 *et seq.,* is the only valid law now existing. If that regulation is considered too harsh in some aspects of its present form, no insuperable obstacle exists to the drafting of another which would preserve underlying concepts of rest, relaxation and recreation, and at the same time give reasonable and fair recognition to the means of their achievement. See, *e. g., Ex parte Sumida,* 177 *Cal.* 388, 170 *P.* 823 (*Sup. Ct.* 1918); *State v. Towery,* 239 *N. C.* 274, 79 *S. E. 2d* 513 (*Sup. Ct.* 1954), appeal dismissed 347 *U. S.* 925, 74 *S. Ct.* 532, 98 *L. Ed.* 1079 (1954).

Accordingly, I would reverse the judgment of the Law Division and, until the Legislature acts again, leave the execution of the Sunday law in the hands of local and county enforcement officers. Mr Justice SCHETTINO authorizes the statement that he joins in this dissent.

BURLING, J., concurring in result.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, and Justices BURLING, PROCTOR and HALL—4.

*For reversal*—Justices FRANCIS and SCHETTINO—2.