MACK PARAMUS CO., MACK PARAMUS AFFILIATES, MACK DE-
VELOPMENT COMPANY AND MACK PARAMUS PARKWAY
CO., PARTNERSHIPS OF THE STATE OF NEW JERSEY, AND
MACK DEVELOPMENT CORP. AND PARAMUS OFFICE
PARK, INC., CORPORATIONS OF THE STATE OF NEW JER-
SEY, PLAINTIFFS-RESPONDENTS, v. THE MAYOR AND
COUNCIL OF THE BOROUGH OF PARAMUS, DEFENDANT-
APPELLANT, AND EXCELSIOR PANBRO COMPANIES, INC.,
T/A MIDLAND PARK FOODTOWN, INTERVENOR-RESPON-
DENT.

Argued March 3, 1986—Decided July 23, 1986.

*Frank J. Cuccio* argued the cause for appellant (*Cuccio & Cuccio,* attorneys).

*George B. Gelman* argued the cause for respondents (*Gelman & McNish,* attorneys).

*Robert L. Ritter* argued the cause for intervenor-respondent (*Cole, Schotz, Bernstein, Meisel & Forman,* attorneys).

PER CURIAM.

This appeal poses once again an issue involving the validity of regulations governing permissible activities on Sunday. This form of government regulation, commonly referred to as Sun-

day closing or Sunday blue laws, has been the subject of recurrent legislative and judicial treatment. The question in this case is whether and to what extent municipalities can enact local Sunday blue law ordinances that prohibit particular activities on Sunday in a manner different from that expressed by the State's statutory Sunday blue law.

Legal challenges were brought to contest the validity of the Sunday blue law ordinances in two municipalities, Paramus and Midland Park. Unlike earlier cases, such as *Two Guys From Harrison, Inc. v. Furman*, 32 *N.J.* 199 (1960), *Masters-Jersey, Inc. v. Paramus*, 32 *N.J.* 296 (1960), and *Vornado, Inc. v. Hyland*, 77 *N.J.* 347 (1978), the present legal attacks are not based on equal protection or other constitutional grounds. The actions here focus solely on whether the State has foreclosed through statutory preemption any power on the part of municipalities to enact local Sunday blue law regulations. The basis for the current challenge is the incorporation of the State's Sunday blue law, *L.*1959, *c.* 119; *N.J.S.A.* 2A:171–5.8 to –5.18 (Chapter 119), as part of the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to :98–4, which also included a general provision for the preemption of any local criminal ordinances that conflict with any of the provisions or policies of the Code. *N.J.S.A.* 2C:1–5(d).

The State's statutory Sunday blue law, as incorporated in the Code, restricts the sale on Sunday of only five categories of goods. *N.J.S.A.* 2A:171–5.18.[1] The provisions of the State law are not operative unless the voters of a county adopt the State

---

[1] The State statute provides:

> On the first day of the week, commonly known and designated as Sunday, it shall be unlawful for any person whether it be at retail, wholesale or by auction, to sell, attempt to sell or offer to sell or to engage in the business of selling, as hereinafter defined, clothing or wearing apparel, building and lumber supply materials, furniture, home or business or office furnishings, household, business or office appliances, except as works of necessary and charity or as isolated transactions not in the usual course of the business of the participants. [*N.J.S.A.* 2A:171–5.8.]

law by referendum, upon which the statutory prohibition will be applicable on a county-wide basis. *N.J.S.A.* 2A:171–5.12. The voters in Bergen County, in which Midland Park and Paramus are located, have adopted the State Sunday blue law. However, each of these municipalities has enacted a more stringent ordinance, prohibiting virtually all business activities on Sunday, with limited exceptions.[2] The asserted differences between these broad local regulations and the State's narrow Sunday blue law have prompted the current litigation.

In the Paramus appeal, several plaintiffs filed an action in lieu of prerogative writ to invalidate the municipality's Sunday closing ordinance. The trial court, applying the preemption provision of the Code, concluded that the intent of the Legislature in passing the Code was to criminalize uniformly minor criminal offenses, such as the sale of prohibited foods on Sundays, and to prevent municipalities from adopting patchwork criminal laws.

The validity of the Midland Park Sunday Blue Law ordinance was challenged initially in municipal court by Excelsior Panbro Companies, t/a Midland Park Foodtown, and The Great Atlantic and Pacific Tea Co., t/a A & P Food Stores, who, as defendants, contended that the selling of food did not fall within the five categories of specifically prohibited activities pursuant to the state statutory blue law provision and therefore was permissible. The municipal court found defendants guilty of violating

---

[2]Paramus' Blue Law ordinance, Ordinance No. 562, since 1968, has provided that "[n]o worldly employment or business, except works of necessity and charity, shall be employed or practiced by any person within the Borough of Paramus on the first day of the week, commonly called * * * Sunday." The Midland Park Ordinance, Ordinance No. 554, enacted in 1974, provides that "no person, firm or corporation shall conduct or do business within the confines of the Borough of Midland Park on the first day of the week, commonly known as Sunday, except for the following enumerated activities: (A) Works of necessity and charity * * *." In addition to the general "necessity and charity" exception, the Midland Park ordinance lists ten specific activities that are excepted from the Sunday Blue Law ban. The Sunday Blue Law ordinance in each municipality establishes penalties for violations.

the ordinance, which it upheld. On appeal to the Law Division, the trial court reversed the defendants' convictions, ruling that Midland Park's ordinance was not enforceable because the Code had preempted the field of Sunday blue laws. Nevertheless, the judge directed that the defendants file an action in lieu of prerogative writ to have the validity of the ordinance declared invalid.

Appeals were taken from both the Paramus and Midland Park judgments to the Appellate Division, where they were consolidated. The Appellate Division ruled that the Code preempted municipal regulation in the field of Sunday blue laws, concluding that Paramus and Midland Park had no authority to enact Sunday closing ordinances. 201 *N.J.Super.* 508, 513 (1985). We granted defendant's petition for certification. 102 *N.J.* 325 (1985).

## I.

The issue presented in this appeal cannot be fully understood and resolved without an appreciation of the history and evolution of the current Sunday closing law. It has generally been acknowledged that the purpose of such enactments was to "insure a day of quiet, rest and relaxation in the community at large." *Auto-Rite Supply Co. v. Township of Woodbridge,* 25 *N.J.* 188, 192 (1952). Sunday closing laws initially prohibited "any kind of servile work, unlawful recreations or unnecessary travels" on the "Lord's Day," excepting only works of mercy or necessity. Allinson, Acts of the General Assembly of the Province of New Jersey (1776) pp. 3–4. These total prohibitions continued until the turn of the last century. In 1893, the Legislature first recognized exceptions for certain activities. *L.* 1893, *c.* 24. It then became legal "for any person or corporation, on the Christian Sabbath, or first day of the week, commonly called Sunday, to print, publish and sell newspapers, to sell and deliver milk, or to walk, ride or drive for recreation,

and to hire horses and carriages or other conveyances for riding or driving." *L.*1893, *c.* 24.

The 1893 act also established municipal options for exercising control over Sunday activities. Local governing bodies were empowered to adopt ordinances or rules deemed necessary and proper to regulate or prohibit the acts made lawful by the act. *Ibid.* These exceptions were continued in somewhat different form in 1933. *L.*1933, *c.* 115.

The modern version of the Sunday blue law stems from its revision in 1951, which provided that "[n]o worldly employment or business, except works of necessity and charity, shall be performed or practiced by any person within this state on the Christian Sabbath, or first day of the week, commonly called * * * Sunday." *L.*1951, *c.* 344; *N.J.S.A.* 2A:171-1 *et seq.* (since repealed). Limited exceptions to the general prohibition of business activities on Sundays permitted the preparation and sale of drugs, meals, prepared food, perishable agricultural and horticultural products, and non-alcoholic beverages. *N.J.S.A.* 2A:171-2. While the 1951 revision provided broad prohibitions against most normal activities on Sunday, it permitted additional activities on Sundays, such as walking, riding or driving for recreation, other recreation, sport or amusement, and such routine matters as the publication and sale of newspapers and the sale and delivery of milk, provided they could be undertaken without causing a disturbance and were authorized in a municipality by a majority vote. *N.J.S.A.* 2A:171-6.

The Legislature, in 1958, amended the Sunday blue laws. *L.* 1958, *c.* 138; *N.J.S.A.* 2A:171-5.1 to -5.7. This amendment, instead of prohibiting comprehensively the sale of "all worldly goods," prohibited the sale only of certain categories of commodities. *N.J.S.A.* 2A:171-5.1. Also, as a concession to the resort areas, where there was a strong popular demand for no Sunday closing regulation, the new law was "inapplicable to counties bordering on the Atlantic ocean having a population of

less than 225,000," *N.J.S.A.* 2A:171–5.5, thereby excluding Atlantic, Ocean, and Cape May counties.

In a legal challenge to the 1958 act, the exclusion of these counties was determined to be arbitrary and unconstitutional. *Sarner v. Township of Union,* 55 *N.J.Super.* 523, 540 (Law Div.1959). In response to this decision, the Legislature, in 1959, enacted Chapter 119, *N.J.S.A.* 2A:171–5.8 to –5.18, the current Sunday closing law. This statute eliminated the exclusion of the seashore counties, instead providing that Sunday closings would "not become operative in any county unless and until the voters of the county shall determine by referendum held pursuant to this act that the same shall apply therein." *N.J.S.A.* 2A:171–5.12.

There was a judicial challenge to this revision on constitutional grounds. *Two Guys from Harrison, Inc. v. Furman,* 32 *N.J.* 199 (1960). It was contended that the statute was beyond the police power of the State; that it contravened the ban against the union of church and state in the Federal Constitution (First and Fourteenth Amendments) and in the State Constitution (Art. I, para. 4); and that the classification of what goods may and may not be sold was violative of the equal protection guarantees of the Fourteenth Amendment and the State Constitution. The Court, in upholding the validity of Chapter 119, observed that because it prohibited the sale of only five categories of goods rather than mandating general inactivity, Chapter 119 "embrace[d] a radically different policy." It held that Chapter 119 repealed by implication the inconsistent regulatory scheme reflected in the 1951 law. *Id.* 32 *N.J.* at 225.

The Court in *Two Guys* also considered the validity of municipal authority in the field of Sunday closings. Significantly, as related to the narrow issue in this appeal, the Court recognized that Chapter 119, in addition to eliminating any penalties for violations, was intended to leave municipalities with the power, they theretofore had, to control and regulate Sunday activity,

and held that municipalities may be empowered to deal directly with issues, such as Sunday closings. 32 *N.J.* at 231.

The validity of municipal Sunday closing regulations was specifically challenged in the companion case to *Two Guys,* namely, *Masters-Jersey, Inc. v. Borough of Paramus,* 32 *N.J.* 296 (1960). There the validity of Paramus Ordinance 403 (the source ordinance for Paramus Article 10, the subject of this appeal) was challenged on equal protection grounds because it involved an inconsistent application of the blue laws from municipality to municipality. The ordinance had incorporated the provisions of the earlier 1951 law, prohibiting all wordly employment or business on Sundays with limited exceptions. Although, as noted, Chapter 119 impliedly repealed the regulatory scheme of the 1951 revision, the Court ruled it did not necessarily vitiate Paramus' ordinance even though the ordinance was modeled after the superseded statute. *Masters-Jersey, Inc. v. Borough of Paramus, supra,* 32 *N.J.* at 302. The Court observed that the source of municipal authority to regulate Sunday activity is the police-power provision of the Home Rule Act, *N.J.S.A.* 40:48–2, which empowers municipalities to enact ordinances for the preservation of the public health, safety, and welfare of its citizens. *Ibid.* The Court held Paramus was entitled to exercise its police power to regulate Sunday activities as long as its ordinance did not conflict with the State policy as reflected in Chapter 119.

> *Chapter 119* does not affirmatively authorize the continuance of activities beyond its scope. Although, as we pointed out in *Two Guys From Harrison, Inc.,* the Legislature in adopting that statute contemplated that citizen activities beyond the statute's interdiction will continue unscathed insofar as state legislation is concerned, yet there is no evidence of a purpose to bar local government from dealing with an evil it may reasonably find to warrant local attention. A municipality may not authorize what the state statute prohibits in any county in which the statute operates, but *Chapter 119* does not prevent the municipality from proscribing other activities if there is an evil justifying the exercise of its delegated police power. [*Ibid.*]

In *Vornado, Inc. v. Hyland,* 77 *N.J.* 347 (1978), the issue of inconsistent application under the county-option provision of Chapter 119 was raised on equal protection constitutional

grounds. The classification of goods subject to Sunday closing was also constitutionally challenged on grounds of vagueness. The Court upheld the law against both constitutional challenges, *id.* at 354 finding that there was a reasonable relation between its regulatory provisions and the legislative objective of relief from interference with Sunday rest and relaxation.

In 1978, the Legislature modernized the criminal law of New Jersey by enacting the Criminal Code, *L.*1978, *c.* 95. The Code specifically repealed various provisions of Title 2A, the former criminal law, and designated other portions of Title 2A that would remain in full force and effect. *N.J.S.A.* 2C:98–2 to –3. As first enacted, the existing Sunday closing law was not excluded from the Code's general repealer, *N.J.S.A.* 2C:98–2; hence, all of the Sunday blue law provisions in Title 2A, including Chapter 119, would seemingly have been repealed under the Code, contrary to the intent of the drafters of the Code who had recommended that no changes be made in the Sunday blue law provisions of Title 2A. *Final Report of N.J. Law Revision Commission,* Vol. I; Appendix A, p. 237. Consequently, prior to its effective date, the Code was amended by Legislature, saving from repeal Chapter 119 as well as *N.J.S.A.* 2A:171–1.1 and –1.2 governing the buying, selling, trading of motor vehicles on Sunday, and specifically provided that these statutory Sunday-closing provisions remain in full force and effect. *L.*1979, *c* 178; *N.J.S.A.* 2C:98–3 (as amended). Chapter 119, having been specifically saved from repeal, thus constitutes the current operative State policy governing Sunday closing under the Criminal Code.

As reflected in the history of Sunday-closing legislation, differing local attitudes toward Sunday activities have been a continuous concern and have constituted a recurrent problem in terms of formulating and implementing a statewide regulatory scheme. Generally, the perceived need to accommodate local interests has been accommodated by the Legislature, and separate municipal regulations of Sunday activities have been a concomitant of the State Sunday blue laws, albeit within the die

cast by preeminent State policy. *Auto Rite Supply Co. v. Woodbridge Township, supra,* 25 *N.J.* at 193. It is against this background that the enforceability of the local ordinances in this appeal must be considered.

## II.

The validity of the municipal Sunday blue law ordinances rests on whether, under the doctrine of state preemption, municipalities have the authority to enact such local ordinances. Preemption has generally been defined as "a judicially created principle based on the proposition that a municipality, which is an agent of the State, cannot act contrary to the State." *Overlook Terrace Management Corp. v. Rent Control Bd. of W. New York,* 71 *N.J.* 451, 461 (1976).

Although it is a judicially-devised standard, the doctrine of state preemption turns upon the intention of the Legislature. If the court determines that the Legislature intended "its own actions, whether it exhausts the field or touches only part of it, to be exclusive," then it will conclude that the State has preempted the field, thereby barring any municipal legislation. *State v. Ulesky,* 54 *N.J.* 26, 29 (1969); *see Summer v. Teaneck,* 53 *N.J.* 548, 555 (1969).

In *Overlook Terrace Management Corp., supra,* the Court outlined five factors to be considered in preemption analysis:

1. Does the ordinance conflict with the state law, either because of conflicting policies or operational effect, that is, does the ordinance forbid what the Legislature has permitted?

2. Was the state law intended expressly or impliedly to be exclusive in the field?

3. Does the subject matter reflect a need for uniformity?

4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?

5. Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Legislature? [Citations omitted]. [71 *N.J.* at 461.]

The analysis in this case, in addition to being informed generally by these principles, entails the application of the specific statutory terms of the Code, *viz:*

> Notwithstanding any other provision of law, the local government units of this State may neither enact nor enforce any ordinance or other local law or regulation conflicting with, or preempted by, any provision of this code or with any policy of this State expressed by this code, whether that policy be expressed by inclusion of a provision in the code or by exclusion of that subject from the code. [*N.J.S.A.* 2C:1–5(d).]

Recently, in *State v. Crawley*, 90 *N.J.* 241 (1982), the Court had the occasion to apply the Code preemption provision. The Court addressed the question of whether local criminal laws dealing with the same subject matter as the Code could be considered to conflict with the Code and therefore were preempted. In that case, the City of Newark contended that its loitering ordinance was enforceable and had not been preempted by the Code of Criminal Justice, which included, in Chapter 33, provisions regulating conduct such as loitering, possession of alcohol in public places by minors, obstructing highways or public passages, harassment, failure to disperse on order of a peace officer and disorderly conduct. *N.J.S.A.* 2C:33–1 to –16.

Harkening to common-law principles of preemption, the Court recognized that municipalities may not enact ordinances on matters otherwise competent for local legislation if the state law preempted the field. 90 *N.J.* at 248. The Court also observed that a state statute may serve to invalidate municipal ordinances even if the statute does not occupy an entire field or facially conflict with local law. In exploring the goals underlying the enactment of the comprehensive Criminal Code, we noted that the purpose of the Code was

> to modernize the criminal law of this State so as to embody principles representing the best in modern statutory law, to eliminate inconsistencies, ambiguities, outmoded and conflicting, overlapping and redundant provisions and to revise and codify the law in a logical, clear and concise manner. [*Id.* at 251 (*quoting* L.1968, c. 281, § 4.]

The Court concluded that the "Code of Criminal Justice itself manifests both 'a clear design for uniform statewide treatment' and a 'complete system of law' sufficient to compel an inference

that the Legislature intended Chapter 33 of the Code to preempt local loitering laws." *Id.* at 250.

The *Crawley* decision is obviously instructive in the instant case. Chapter 33 of the Code addresses in great detail a variety of public conduct. Inferentially, the omission of loitering as a specific and particular offense from this comprehensive body of prohibitions assumes purposeful significance. Because the criminal laws, prior to the Code, clearly treated loitering as a particular offense, its omission from an otherwise comprehensive treatment of the subject under the Code dispels the possibility that its deletion was mistaken, accidental or inadvertent; rather, it strongly evinces a legislative intent to de-criminalize this form of conduct and to prevent municipalities from independently regulating or imposing penal sanctions for this activity. Hence, the Code's standard of preemption by exclusion, as applied to the Newark ordinance, prohibited enforcement of a municipal loitering regulation.

In this case, the legislative treatment of the regulatory subject-matter is quite different. Here, the Legislature did not purport to treat the subject of Sunday closing comprehensively or exhaustively. Unlike Chapter 33 of the Code, which treated in considerable detail a broad range of prohibited conduct, the Legislature with respect to Sunday closings chose simply to adopt the existing law. Furthermore, it did so not by actually reenacting particular prohibitory regulations; instead, it simply referred to the present law, Chapter 119, and incorporated that law *in toto* into the Code. And, as we have seen from its terms and its history, Chapter 119 itself is a limited and selective, as opposed to a detailed and comprehensive regulation of Sunday activities.

Unlike the standard that was used in *Crawley*, the Code's preemption-by-exclusion standard is not applicable in determining the validity of local Sunday-closing regulations. Accordingly, the analysis must shift to a consideration of the factors relevant to an application of the doctrine of preemption by

inclusion. In the language of the Code this entails a determination of whether local ordinances conflict with Code provisions or other aspects of state policy expressed through the Code. *N.J.S.A.* 2C:1–5(d).

A conflict between state and local law can occur if the latter permits what the former prohibits or, conversely, prohibits what state law permits. *See Auto-Rite Supply Co. v. Mayor and Township Committeemen of Woodbridge, supra,* 25 *N.J.* 188. Here, the local ordinances do not permit any activities that the State Sunday-closing law prohibits. Moreover, while the State Sunday-closing law specifically forbids only five activities on Sunday, it does not expressly or affirmatively authorize the conduct of activities that are not specifically forbidden by State law. *See Masters-Jersey, Inc. v. Borough of Paramus, supra,* 32 *N.J.* at 302. Hence, it cannot be said that the local ordinances in this appeal, which are broader than Chapter 119, prohibit that which the state law permits. These ordinances by their express terms are not in actual conflict with Chapter 119, and preemption arising from an asserted conflict does not apply.

Further, in determining whether a local regulatory law has been preempted by a state statute through inclusion of the subject matter, comprehensive and pervasive regulation by the State, as well as the need for statewide uniformity over the subject matter, is highly relevant. Thus, where the state regulatory scheme provides wide coverage and is broadly inclusive of the subject matter, local controls may be discordant and disruptive, with no appropriate place in the legislative plan. *See State v. Crawley, supra,* 90 *N.J.* at 251. On the other hand, if state law is only narrowly focused upon particular matters encompassed within a much broader spectrum of activity, local regulation may be entirely proper. *See Township of Chester v. Panicucci,* 62 *N.J.* 94, 101–02 (1973) (narrow prohibition on hunters as to possession of a loaded gun at certain locations represented statewide policy of minimum regulation,

which did not preempt entire field of safety, and municipalities could enact more stringent regulations); *Belmar v. Buckley,* 187 *N.J.Super.* 107, 111–12 (1982) (only lewdness was intended to be addressed in the Code, and regulation of public indecency was left to municipalities).

Moreover, not all problems that have generated a concern throughout the State demand uniform and homogeneous treatment at the state level. A subject in need of statewide uniformity is one in which the "needs with respect to those matters do not vary locally in their nature or intensity. Municipal action would not be useful, and indeed diverse local decisions would be mischievous and even intolerable." *Summer v. Township of Teaneck, supra,* 53 *N.J.* at 553. "[P]ractical considerations may warrant different or more detailed local treatment to meet varying conditions or to achieve the ultimate goal more effectively." *Inganamort v. Borough of Fort Lee, et al.,* 62 *N.J.* 521, 528. As evidenced by the history of Sunday closing regulations, local concerns and responses to the problems of Sunday activities have long been acknowledged and accommodated. *Masters-Jersey Inc., v. Borough of Paramus, supra,* 32 *N.J.* 296.

Unlike the statutory provisions treated in *Crawley,* the state prohibition in this case not only tolerates, it clearly provides a place for, local autonomy. Chapter 119 explicitly authorizes local regulation. *N.J.S.A.* 2A:171–5.8. Indeed, in 1960, the Court had ruled expressly that Chapter 119 allows municipal regulation of Sunday activities. *Masters-Jersey, Inc., v. Borough of Paramus,* 32 *N.J.* at 302. When the Legislature incorporated Chapter 119 into the Code, it must be presumed that it was aware of and adopted the statute with this interpretation. *See, e.g., Quaremba v. Allan,* 67 *N.J.* 1 (1975); *Brewer v. Porch,* 53 *N.J.* 167 (1969). An amendment of the statute after a judicial construction without any changes in the provisions so interpreted is persuasive evidence that such construction reflects the legislative intent. *See Petition of Keogh-*

*Dwyer,* 45 *N.J.* 117 (1965); *Lemke v. Bailey,* 41 *N.J.* 295, 301 (1963).

 We cannot conclude that the Legislature, with respect to the subject of Sunday closing, has undertaken to deal with the matter so comprehensively, uniformly, or consistently on a statewide basis as impliedly to preempt, nullify, or supersede all local Sunday closing regulations.[3]

### III.

The ultimate question to be answered in a preemption analysis in this context is whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act. *Summer v. Teaneck, supra,* 53 *N.J.* at 535.

As noted, the Court in *Masters-Jersey, Inc. v. Borough of Paramus, supra,* 32 *N.J.* 296 clearly held that municipalities were authorized under Chapter 119 to enact their own local Sunday-closing ordinances. We are satisfied that when it incorporated Chapter 119 in the Code the Legislature intended to preserve the Sunday Closing regulatory scheme as then understood. That understanding included local authority to regulate Sunday activities. We find no evidence of legislative preemption in the area of Sunday closings.

Accordingly, the judgment of the Appellate Division is reversed.

---

[3]We note that the dissenting opinion stresses the seeming arbitrariness of dual regulation of Sunday activities throughout the state. Post at 580. This scheme of regulation could not, it is suggested, have been intended by the Legislature. The argument is reminiscent of the constitutional challenges rejected in *Vornado, Inc. v. Hyland,* 77 *N.J.* 347 (1978). However, no constitutional issue is raised and we therefore express no view as to the constitutionality of the local ordinances in this case.

O'HERN, J., dissenting.

Today Sunday is many things to many people. It is a day upon which the vast majority of citizens seek respite from the pressures and demands of ordinary routines. To some, it is a day for religious devotion alone. To others, whether or not members of faiths commanding religious observance, it is a secular holiday, a day for play, hobbies, recreation or relaxation. To still others, it is a combination of all of these. It is a day for family and friendly reunions. Most people want Sunday for themselves to do as they feel they should, each to prepare himself in his own way to meet the demands of Monday morning. [*Two Guys from Harrison, Inc. v. Furman*, 32 *N.J.* 199, 216 (1960).]

To this it may be added, borrowing the words of Justice Handler, dissenting in *Vornado, Inc. v. Hyland*, 77 *N.J.* 347 (1978), *appeal dismissed*, 439 *U.S.* 1123, 99 *S.Ct.* 1037, 59 *L.Ed.* 2d 84 (1979), that "Sunday is a day for [working] for a great many people and for those who are so minded this activity, depending upon individual circumstances, is necessitous, convenient, diversionary and [even, for some,] recreational, at bottom reflecting the myriad personal wishes and subjective choices of individuals." 77 *N.J.* at 381.

In preparing to meet the demands of Monday morning, judges and lawyers might choose to engage in "worldly employment or business" of the type prohibited by the Paramus ordinance; they may have to go to a commercial office building to review briefs and authorities. Doctors who are preparing for an operation scheduled for Monday might want to consult their office files on Sunday to review materials. Salesmen, computer programmers, and graphic artists might do the same. Today's woman, trying to juggle a career with homelife, might want to catch up on assignments over the weekend rather than to remain at work into the evening. Some may even wish to do this work at home.

Unless I misread the scope of the Paramus ordinance, each of the foregoing activities would be subject to punishment. I would not want to have to prove that such work was either that "of necessity" or "charity," activities that are exempted from the prohibition. The Borough of Paramus does not make any other distinctions among those works that one might conduct

without unreasonable interference with the repose of one's neighbors on a day that all agree is a day that people should have for themselves.[1]

## I.

The people of the State of New Jersey have learned to live with the balanced regulatory approach to Sunday closing laws expressed in the provisions of *N.J.S.A.* 2A:171–5.8 ("it shall be unlawful for any person * * * to sell, attempt to sell or offer to sell or to engage in the business of selling * * * clothing * * *, building and lumber supply materials, furniture, home or business or office furnishings, household, business or office appliances * * *" on Sunday). This legislative classification of activities that have the capacity to interfere with the peace and tranquility of others was sustained by this Court in *Vornado, Inc. v. Hyland, supra,* 77 *N.J.* at 363. I do not believe that the Legislature intended that society engage once again in the deeply divisive debate that surrounds the renewal of sweeping Sunday closing laws, such as those set forth in the Paramus ordinance.

Such a vague ordinance suffers from the constitutional infirmity that Justice Douglas condemned in *Papachristou v. City of Jacksonville,* 405 *U.S.* 156, 92 *S.Ct.* 839, 31 *L.Ed.*2d 110 (1972). It "permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" *Id.* 405 *U.S.* at 170, 92 *S.Ct.* at 847, 31 *L.Ed.*2d at

---

[1]Exempted from the sweep of the Paramus ordinance are preparation and sale of drugs, meals, prepared food, perishable agricultural and horticultural products, non-alcoholic beverages, and certain alcoholic beverages; printing, publishing, and selling newspapers, magazines, and periodicals; selling and delivering milk, bread, and baked goods; walking, riding, or driving for recreation; hiring conveyances; selling gasoline for automobiles; selling and dispensing tobacco products; exhibiting, offering for sale, and selling residential dwellings, and engaging in lawful recreation, sport, or amusement.

120 (quoting *Thornhill v. Alabama,* 310 *U.S.* 88, 97–98, 60 *S.Ct.* 736, 741–742, 84 *L.Ed.* 1093, 1100 (1940)). If the Legislature intended such sweeping regulatory programs to be enacted, courts would have to narrow their sweep by construction, limiting their scope to a constitutionally permissible range. In view of these overriding concerns, I disagree with the majority's conclusion that the Legislature intended municipal Sunday closing laws that are inconsistent and at variance with the state regulatory program to be an authorized subject for municipal legislation.

In *State v. Crawley,* 90 *N.J.* 241 (1982), we recognized that the Legislature's central purpose in enacting the Code of Criminal Justice was "to create a consistent, comprehensive system of criminal law." *Id.* at 250. The Legislature stated these goals in the statute that established the New Jersey Criminal Law Revision Commission:

> It shall be the purpose of [the Code of Criminal Justice] to modernize the criminal law of this State so as to embody principles representing the best in modern statutory law, *to eliminate inconsistencies, ambiguities, outmoded and conflicting, overlapping and redundant provisions* and to revise and codify the law in a logical, clear and concise manner. [*L.* 1968, *c.* 281, § 4 (emphasis supplied).]

If municipalities were permitted to adopt local counterparts to the Sunday closing law provisions of the Code, the express legislative policy of eliminating overlapping and redundant provisions from the criminal law would be defeated.

The majority relies on general-preemption precedent in support of its conclusion that the Legislature did not intend to monopolize the field by its Sunday closing legislation. *Ante* at 573–578. However, in *Crawley* we referred to traditional preemption law only to point out that the "result accords with traditional principles of local legislative power and the doctrine of state preemption." 90 *N.J.* at 247.

The essence of *Crawley* was its reliance upon the Code's negative-preemption provisions:

> Notwithstanding any other provision of law, the local governmental units of this State may neither enact nor enforce any ordinance or other local law or

regulation conflicting with, or preempted by, any provision of this code or with any policy of this State expressed by this code, whether that policy be expressed by inclusion of a provision in the code or by exclusion of that subject from the code. [*N.J.S.A.* 2C:1–5(d), *quoted in part in State v. Crawley, supra,* 90 *N.J.* at 244.]

## II.

In this case, the Legislature has expressed its intent that its regulatory program be the state policy both by inclusion and exclusion. The evolution of state policy on municipal blue laws has been uneven. The statutory evolution has been accurately set forth in the majority opinion. *Ante* at 568–573. The change in policy requires closer analysis. Because the reader will probably have difficulty following references to the various statutory sections, I refer to the legislative history in shorthand terms.

### The Statewide Ban of 1951
### (Article 1 of the 1951 Revision [2])

The core of the Statewide Ban of 1951 was *N.J.S.A.* 2A:171–1, which stated:

> No worldly employment or business, except works of necessity and charity, shall be performed or practiced by any person within this state on the Christian Sabbath, or first day of the week, commonly called and hereinafter designated as Sunday.

This replaced the ban of the earlier statute. *See Two Guys from Harrison, Inc., supra,* 32 *N.J.* at 208. The remaining sections of Article 1 excepted from 2A:171–1's sweep the sale of drugs, meals, prepared food, and certain alcoholic and all non-alcoholic beverages (2A:171–2); prohibited the service of civil process on Sundays (2A:171–3); provided a limited exemption from 2A:171–1 for persons who observed the Sabbath on Saturdays (2A:171–4); and exempted those who observed the Sab-

---

[2] As originally enacted, the 1951 revision contained two articles: Article 1, consisting of *N.J.S.A.* 2A:171–1 through –5, and Article 2, consisting of *N.J.S.A.* 2A:171–6 through –12.

bath on Saturdays from answering to any judicial process or performing the duties of any office or military service on Saturdays (2A:171–5).

### The Local Option of 1951
#### (Article 2 of the 1951 Revision)

*N.J.S.A.* 2A:171–6 through –12 of the 1951 revision outlined a procedure whereby municipalities could exempt additional activities from the blanket proscription of 2A:171–1 by referenda. This limited authorization for local regulation of Sunday activities was traced to a similar provision dating back to 1893. Thus, the 1951 revision continued the practice of permitting limited local exceptions to the ban on Sunday activity. The key exceptions that a municipality could make included the printing, publishing, and selling of newspapers; selling and delivering milk; walking, riding, or driving for recreation; hiring conveyances for riding and driving; and engaging in lawful recreation, sport, or amusement. *See Two Guys from Harrison, Inc., supra,* 32 *N.J.* at 208.

Following the 1951 revision of New Jersey's Sunday closing laws, the dominant theme of judicial response was to insist on uniformity with state policy. In *Auto-Rite Supply Co. v. Mayor of Woodbridge,* 25 *N.J.* 188 (1957), this Court mandated an all-or-nothing approach:

> In summarizing, it may be said: The state policy is a day of rest and relaxation. Sunday closing ordinances may not be validly enacted to conflict with a statute which declares state policy, namely, no worldly employment or business may be performed, excepting works of necessity and charity within the statutory contemplation and those activities mentioned in the statute and placed with the will of the electorate by local referendum vote. *There is no middle ground.* The Woodbridge ordinance conflicts with state policy and it is therefore void and of no effect. [*Id.* at 196 (emphasis added).]

### The Statewide Ban of 1958
#### (*L.* 1958, *c.* 138)

Because of the preemptive effect of the 1951 statewide ban (as of 1960, only three of the 567 municipalities had conformed,

*Two Guys from Harrison, Inc., supra,* 32 *N.J.* at 210) and the lack of any effective penalty, *State v. Fair Lawn Serv. Center, Inc.,* 20 *N.J.* 468, 474 (1956), the ban of 1958 was enacted to supplement the 1951 statewide ban by specifically prohibiting the Sunday sale of specified categories of goods and adding penalty provisions. The goods that could not be sold were "clothing or wearing apparel, building and lumber supply materials, furniture, home or business or office furnishings, household, business or office appliances." *L.* 1958, *c.* 138, § 1. It added penalties of $25 for first offenses, $100 for second offenses, and $200 or imprisonment for third offenses. The Act excluded three shore counties, however, and was thereby held invalid in *Sarner v. Township of Union,* 55 *N.J.Super.* 523, 545 (Law Div.1959).

### The County Option of 1959
### (*L.* 1959, *c.* 119)

In response to *Sarner,* the Legislature enacted *L.* 1959, *c.* 119 (2A:171-5.8 to -5.18), often referred to as "Chapter 119." This act contained substantially the same prohibition on sale of certain goods and services as that described in the 1958 statute. It was to be operative only in those counties where the voters determined by referendum it should apply. *L.* 1959, *c.* 119, § 5 (codified at *N.J.S.A.* 2A:171-5.12). Following the adoption of Chapter 119, *N.J.S.A.* 2A:171, in an opinion described by Justice Francis in dissent as one of "judicial legerdemain," 32 *N.J.* at 237 this Court discerned a new state policy of limited prohibition of Sunday activity and legislative neutrality on local options. *Two Guys from Harrison, Inc., supra,* 32 *N.J.* 199. The majority in *Two Guys* interpreted the county option provisions of Chapter 119, although denominated an act to supplement the 1951 revision, as in fact an act to repeal the provisions

and policy of conformity contained therein. *Id.* at 223–25.[3] Finding the policy of uniformity repealed, the Court then sustained an earlier Paramus ordinance almost identical with this one on the basis that "[a] municipality may not authorize what the state statute prohibits in any county in which the statute operates, but *Chapter* 119 does not prevent the municipality from proscribing other activities if there is an evil justifying the exercise of its delegated police power." *Masters-Jersey, Inc. v. Mayor of Paramus,* 32 *N.J.* 296, 302 (1960).

This, then, was the background when, in the summer of 1978, the New Jersey Legislature was considering adoption of the new Code of Criminal Justice.[4] The proposed Code contained an express repeal of all state statutes regulating or limiting Sunday activity. Notwithstanding what is described as public objection and public pressure in adopting the Code, the Legislature left intact the express repeal of all prior Sunday closing laws, including Articles 1 and 2 of *N.J.S.A.* 2A:171 and Chapter 119. *See N.J.S.A.* 2C:98–2.

The same contemporary accounts disclose that prior to the effective date of the Code in 1979 the Legislature considered a number of bills designed to restore the power of municipalities to impose Sunday closings. In the consensus amendments to the Code, *L.* 1979, *c.* 178 (effective September 1, 1979), the

---

[3]Although basing its decision on the arbitrariness of the classifications chosen to supplement the 1951 revision, the Court noted with respect to a blanket policy against Sunday activity that "it is difficult to find a basis under the police power for such extraordinary restraint upon individual freedom." *Two Guys from Harrison, Inc. v. Furman,* 32 *N.J.* 199, 217 (1960).

[4]In their Appellate Division brief, plaintiffs set out a version of the legislative history based on contemporary news accounts. Plaintiffs state that "on the eve of [the Legislature's] adopting the Code * * * [t]he Court's decision in *Vornado [Inc. v. Hyland]* was anxiously awaited because the Code, which already had passed the Assembly, contained an express repeal of all State statutes regulating or limiting Sunday activity." Moreover, "[s]ome legislators were said to have anticipated that the *Vornado* Court would declare Chapter 119 unconstitutional and thereby insulate the Legislature from any public recrimination resulting from the repeal." No one contests plaintiffs' account.

Legislature saved only Chapter 119, the County Option. The Legislature expressly repealed the general prohibitions of Articles 1 and 2 of *N.J.S.A.* 2A:171, *i.e.*, the Statewide Ban and the Local Option provisions. (Left intact was the specific provision concerning buying, selling, and trading motor vehicles on Sunday, *N.J.S.A.* 2A:171–1.1) For the first time since 1893, the New Jersey Legislature expressly withdrew statutory recognition of municipal regulation of Sunday activities.

The policy of legislative neutrality on inconsistent municipal regulation of Sunday activities has been repealed by the Code's policy of consistency. Hence, the majority's reliance on *Masters-Jersey, Inc.* is misplaced. The Appellate Division correctly read that legislative history as follows: "[T]he Legislature in the Code made affirmative decisions to preserve the county options set forth in Chapter 119, to clear from the statute books the superseded broad prohibition and municipal relaxation thereof, and to eschew any further municipal regulation." 201 *N.J.Super.* 508, 512. Thus it correctly concluded that "[u]nlike the state of the law at the time of *Masters-Jersey, Inc.*, as of the effective date of the Code, the State no longer merely set one state-wide level of criminal prohibitions subject to supplementation at the municipal level within the same areas in which the Legislature had spoken." 201 *N.J.Super.* at 513. To this I would add only that in the two most recent legislative responses to Sunday sales, each action has reflected an apparent legislative acceptance of the paramount state policy expressed in Chapter 119.

*L.* 1984, *c.* 160 (approved and effective October 1, 1984), allows any city of the first class located within any county that has adopted the referendum provisions of Chapter 119 prohibiting Sunday sales to conduct a referendum within the city to determine if the county option shall be inoperative in that city. If a majority of all votes cast is against the question ("[s]hall Sunday sales be permitted in this city?"), the provisions of Chapter 119 remain operative, *i.e.*, only those items that are prohibited from sale on Sundays under the county option refer-

endum would continue to be prohibited in the municipality. The final, and to me most persuasive, legislative reaction to the problem is set forth in *L.* 1985, *c.* 417 (approved and effective January 13, 1986), which permits a disapproving municipality in any county that has approved Sunday sales by a referendum held pursuant to Chapter 119 to conduct a local referendum on the issue. Significantly, this legislation incorporates the definition found in *L.* 1985, *c.* 271 that " 'Sunday sales' means selling, attempting to sell, offering to sell or engaging in selling the goods enumerated in section 1 of *P.L.* 1959, *c.* 119 (c. 2A:171–5.-8) on Sunday." It seems needless to ask why the Legislature should feel compelled to authorize municipalities to opt out of a county referendum approving sales if the municipality already had, as the majority assumes, the general-ordinance power to ban all Sunday worldly activities.

I would affirm the judgment of the Appellate Division. Justice Garibaldi joins in this opinion.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER and POLLACK—4.

*For affirmance*—Justices O'HERN and GARIBALDI—2.

